THACHER HOTEL, INC.
*vs.*
MARDELLE S. ECONOMOS

York.   Opinion, February 4, 1964.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, MARDEN, JJ.

*Waterhouse, Spencer and Carrol,* for Plaintiff.

*J. Armand Gendron,* for Defendant.

WILLIAMSON, C. J.   On appeal.   This is an action on a "management contract" between the plaintiff corporation and the defendant relating to the operation of dining rooms in the plaintiff's hotel.   The defense is that the contract was illegal in light of the liquor licensing statute, and hence the plaintiff may not recover thereon.

The case was heard in the Superior Court upon an agreed statement of facts.   The defendant admits (assuming the legality of the contract) the claims of the plaintiff for minimum payments and expenses incurred for sales, social security, state and federal unemployment and withholding taxes for which judgment was entered for $1267.77 with interest and costs.

In the absence of oral testimony, the rule that findings of fact below stand unless clearly erroneous is not applicable. We are free to find the ultimate facts from the agreed primary facts without giving weight to findings inherent in the decision of the sitting justice.   *Allen* v. *Kent,* 153 Me. 275, 136 A. (2nd) 540.   The rule is not altered by the Maine Rules of Civil Procedure.   See Rule 52; Field & McKusick Maine Civil Practice, §§ 52.7 and 52.8.

For the period in question in 1958, and indeed from the commencement of the "management contract" in 1955, the plaintiff held and exercised a hotel license as a bona fide hotel for the sale of liquor for consumption on the premises. The pertinent provisions of R. S., c. 61, entitled "Laws Relating to Liquor" are:

"Sec. 1.   **Definitions.**   'Hotel' shall mean any reputable place operated by responsible persons of good reputation, where the public, for a consideration, obtains sleeping accommodations and meals under one roof and which has a public dining room or rooms operated by the same management open and serving food during the morning, afternoon and evening, and a kitchen, apart from the public

dining room or rooms, in which food is regularly prepared for the public on the same premises."

"Sec. 42. Licenses for consumption sale. Licenses for the sale of spirituous and vinous liquor to be consumed on the premises where sold may be issued to clubs and to bona fide hotels . . . "

The argument of the defendant in substance is: (1) that the plaintiff under the "management contract" with the defendant did not have "a public dining room or rooms *operated by the same management*" (emphasis supplied); (2) that the plaintiff, for this reason alone, was not a bona fide hotel and so was not entitled to a liquor license; (3) that the "management contract" thus dealt with an unlawful enterprise, and (4) that public policy denies recovery thereon.

The key words in the controversy are "operated by the same management." The decision turns upon the meaning of these words in the statute, and their application to the "management contract" as we construe its terms.

Before discussing the facts and the contract in detail we may eliminate certain questions from consideration.

First — As we shall see, there is nothing whatsoever inherently wrongful or unlawful about the "management contract." If it were not for the applicability of the liquor law, liability of the defendant would not be questioned. In such case it would be immaterial whether management of the dining room was in the plaintiff corporation or the defendant.

Second — The "management contract" was unquestionably entered into with the operation of dining rooms to meet the requirement of the liquor laws in the minds of the parties. In short, the contract was in furtherance of the operation of the hotel with a liquor license.

Third — If the contract was in furtherance of an unlawful purpose, that is, to obtain a liquor license by subterfuge with management of the dining rooms *not* in the plaintiff,

it would be an illegal contract on which plaintiff could not recover.

The following cases in which no recovery was allowed illustrate the principle: *Brown* v. *Tuttle*, 80 Me. 162, 13 A. 583 (for services or money furnished in furtherance and for continuance of living together unlawfully as husband and wife); *Morris* v. *Telegraph Co.*, 94 Me. 423, 47 A. 926 (on failure to deliver a telegram sent in furtherance of a gambling contract); *Jolovitz* v. *Redington & Co., Inc.*, 148 Me. 23, 88 A. (2nd) 589 (contract involving chance); *Stacy* v. *Brothers* (Conn.), 107 A. 613 (by purchaser of saloon under contract to operate unlawfully under seller's license); *Turner* v. *Schmidt Brewing Co.* (Mich.), 270 N. W. 750 (under contract with brewery to remodel retailer's beer gardens when statute prohibited aid by wholesaler to retailer). See also cases in which without the required license there can be no recovery for services. *Randall* v. *Tuell*, 89 Me. 443, 36 A. 910 (innkeeper); *Black* v. *Mutual Life Asso.*, 95 Me. 35, 49 A. 51 (insurance agent); *Harding* v. *Hagar*, 60 Me. 340 (freight). See also 5 Williston, Contracts § 1766 (rev. ed.); 6A Corbin, Contracts § 1518, p. 750. Compare *Tillock* v. *Webb*, 56 Me. 100 (Sunday contract).

A contract in furtherance of obtaining a hotel liquor license unlawfully is plainly against our public policy. That such a contract may not be in direct contravention of a statute does not lessen the force of the public policy against its enforcement.

Fourth — "The law leaves the parties to an illegal contract 'where it finds them.'" *Jolovitz* v. *Redington & Co., Inc., supra*, p. 29. The public policy, expressed in law, is designed not to protect the defendant as here from an apparently improvident bargain, but to deter others from entering into like illegal contracts.

We are not concerned with our conception of fairness between the parties. The defendant does not deny that she

owes the plaintiff what it claims under the contract. She does no more than say that the power of the State is not available to the plaintiff to establish its claim and to enforce judgment thereon.

Fifth — To invalidate a contract on the ground of public policy, the "impropriety of a transaction," to use Professor Williston's words, must be clearly established. 5 Williston, *supra,* § 1629A. Our court in *Bell* v. *Packard,* 69 Me. 105, in which the issue was whether Maine or Massachusetts law controlled, said, at p. 111: ". . . no contract must be held as intended to be made in violation of the law, whenever by any reasonable construction it can be made consistent with the law . . . "

> "In general and unless restrained by valid statutes, competent persons have the utmost liberty of making contracts. Agreements voluntarily made between such persons are to be held sacred and enforced by the courts, and are not to be lightly set aside on the ground of public policy or because as events have turned it may be unfortunate for one party." *Crimmins & Peirce Co.* v. *Kidder Peabody Accept. Corp.,* 282 Mass. 367, 185 N. E. 383, 388, 88 A. L. R. 1122, and annot. 1131.

See also 12 Am. Jur. *Contracts* § 251, 17 C. J. S. *Contracts* § 211 (d).

We summarize the contract, headed "management contract," between Thacher Hotel, Inc., the plaintiff corporation, called the "Owner," and the defendant, called the "Food Manager," as follows:

> "1. The Owner shall employ the Food Manager for the term of five (5) years from [January 3, 1955] until the close of business on the Saturday following [January 3, 1960], as manager of the Coffee Shoppe and Dining-Cocktail Room located in the premises of the Owner known as Thacher Hotel. . . .

"2. The Food Manager shall well and faithfully serve the employer in such capacity, and shall at all times devote her whole time, attention, and energies to the management and improvement of said business, and shall perform all such services, acts and things as the Owner shall from time to time direct as hereinafter set forth:

"(a) The Food Manager will have exclusive direction and responsibility of purchasing, storage, preparation and service of all food within the Thacher Hotel, specifically set forth as the kitchen, Coffee Shoppe, Dining-Cocktail Room, and in the rooms of the Hotel whenever such is required by guests of the Hotel."

(b) Limits the use of the Dining-Cocktail Room for parties and banquets.

"(c) The service of beer, wines and liquors will be made by the waiters or waitresses, and such sales of beer, wines and liquors shall be accurately recorded on a separate check from the food check, and such separate checks shall be identified as Cocktail Bar checks, and payment of such Cocktail Bar checks shall be made after each serving in a manner prescribed by the Owner, and shall not constitute in any manner a part of food income."

(d) Owner is responsible for charges by hotel guests.

"(e) The Food Manager will have the exclusive responsibility for the food operation without undue interference by the Owner, except in such cases specifically referred to herein. However, at times mutually agreeable, the Food Manager and the Owner or the Owner's representatives shall discuss and consider matters which may be of mutual interest in maintaining efficient and profitable operation.

"(f) The food operation shall be conducted under the name and style of 'Thacher Hotel Coffee Shoppe.'"

(g)   All receipts from the food operation shall be deposited in the bank in the name of "Thacher Hotel Coffee Shoppe." "All accounts receivable and payable shall be in the name of 'Thacher Hotel Coffee Shoppe,' and all expenditures to be made by check, except such items normally paid from petty cash, in which case a proper set-up of accounting shall be prescribed. All funds in said account shall be under the direction and the exclusive responsibility of the Food Manager, and all checks for withdrawal from said account shall be signed by the Food Manager, or by such persons designated by her."

(h), (i), (j), and (k) relate to maintenance of accurate accounts by Food Manager, food income to include juke box and tobacco sales, responsibility of Food Manager for care and maintenance of equipment, and privilege of replacing and installing new equipment to be paid from food income and to remain Owner's property.

"(l)   The Coffee Shoppe shall be kept open at least six (6) days per week prepared for service of meals at the usual mealtimes, morning, noon and evening."

3.   The Food Manager is required to deposit $1,000 in escrow and certain amounts weekly.   In the event of the death of the Food Manager, the owner agrees after payment of outstanding obligations to release the balance of the escrow deposit.

4.   The Food Manager guarantees payment to the owner of certain percentages of weekly receipts with minimum guarantee for the period in question in 1958 of $85 a week.

5.   and 6.   Workmen's Compensation, Public Liability and fire insurance, and all taxes and licenses pertaining to the food operation shall be paid therefrom "in conjunction with the Hotel as prescribed by the Owner."

"7. The Food Manager shall have the authority and responsibility to operate the food business without interference from the Owner. It is understood, however, that the Food Manager will conduct the operation in a high grade and orderly manner, and will not permit questionable conduct or entertainment on the premises; that the Food Manager will pay all food and other expenditures of said operation from the income thereof and within a time consistent with good business practices, and not through negligence impair the good credit of the Owner."

8. In event of fire weekly payments suspended while food operation impossible.

9. and 10. Gas, electricity and fuel paid from food operation; inventory at commencement of contract at costs to be paid by Food Manager to Owner.

"11. After the payment of all accounts for food, wages, taxes, insurance and weekly payments to Owner, and other expenses chargeable to the food operation, the Food Manager shall receive as her compensation the entire net profit from said food operation.

"12. It is understood by the Owner and the Food Manager, that wherever the word 'food' or 'food operation' is used herein, beer, wines and liquor are specifically excluded therefrom and that the Food Manager has no connection therewith or responsibility therefor.

"13. A control of income and expense of the food operation shall be maintained in such a manner prescribed by the Owner, as will insure proper conduct of the business in respect to income and payment of financial obligations when due.

"14. The Food Manager shall be responsible for the premises where food is served, sleeping rooms excepted, and shall maintain the premises clean and neat, including the Dining-Cocktail Room, at all times.

"15. If at any time during the term of this agreement, any of the stores in the so-called Hotel Thacher Block shall become vacant, the Owner hereby agrees with the Food Manager that it will not lease, demise or let any such store or stores to any parties who shall engage in the business of serving food to the public, but this provision shall not apply to the continued operation of the store in said Block now engaged in the retail sale of ice cream, candy and popcorn."

From our study of the contract we are satisfied that within the meaning of Sec. 1 of the statute the plaintiff, that is to say "the same management," operated the dining rooms in the Thacher Hotel and was a "hotel" for licensing purposes.

In so construing the contract, we give effect to the intentions of the parties, which surely were to enter into an arrangement permissible under the licensing laws. The defendant has failed at the least to establish clearly any impropriety compelling the invalidation of the contract on grounds of public policy.

There are in the contract certain provisions often found in employment contracts and others often found in lessee or independent contractor transactions. Taken as a whole, having in mind the purpose of the contract we conclude that the plaintiff retained effective management of the dining rooms. Webster's New International Dictionary (second edition) defines "management" as "The collective body of those who manage or direct any enterprise or interest; the board of managers." The defendant in her capacity as "food manager" was not unlike a department or store manager, or the manager of a baseball club. Her power and authority, unquestionably broad, do not deny an employer-employee relationship with the plaintiff.

It is significant that the dining rooms were conducted in the name of and as an integral part of the plaintiff's hotel,

and that the plaintiff recognized its full and complete responsibility for their operation. The present action was brought in part to recover for taxes paid on goods purchased and employees' wages arising from the "food operation."

The provisions for compensation by which the plaintiff received a percentage of gross income with a minimum guarantee and the defendant received the balance, and bore the losses, if any, do not compel the conclusion that the defendant was not under the direction, control or management of the plaintiff. The minimum guarantee and loss provisions would no doubt more likely arise in a lease or independent contractor situation. It does not follow, however, that if the parties *otherwise intend*, we may not give effect to their contract. We must not lose sight of the provisions for employment of the defendant with the careful restrictions in the use of the "food income," and the full and complete responsibility of the plaintiff for the operation of the hotel in its several departments.

The Thacher Hotel, that is the plaintiff corporation, met without challenge on this record the strict requirement that it is a "reputable place operated by responsible persons of good reputation." It chose to give broad authority to a "food manager." It did not, however, give up or transfer, or lose its "management" of the dining rooms and thereby fail to qualify for the license so obviously a vital part of the business enterprise.

The plaintiff did not inform the Commission of the contract with the defendant in making its application for a hotel license. The defendant urges that it therefore "failed to disclose the complete and entire ownership or any interest in the establishment." R. S., c. 61, § 28. Whether the plaintiff failed in this respect is a matter for the determination of the State Liquor Commission and not of the courts in a collateral proceeding.

32

We do not attempt to establish or to indicate the precise meaning of "operated by the same management" in Sec. 1 of the statute. We limit our opinion to the facts before us. Public policy does not here require that the defendant escape responsibility for carrying out the terms of her contract.

The entry will be

*Appeal denied.*