**In re VALUATION OF COMMON
STOCK OF LIBBY, McNEILL
& LIBBY.**

Supreme Judicial Court of Maine.

Aug. 16, 1979.

Verrill & Dana by John A. Mitchell (orally), Andrew P. Geoghegan, Andrew M. Horton, Portland, for petitioner.

Thompson, Willard & McNaboe by Bruce M. Tompkins (orally), Richardson, Hildreth, Tyler & Troubh by William K. Tyler, Peter H. Jacobs, Portland, for dissenting stockholders.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

McKUSICK, Chief Justice.

For the first time since the enactment of the Maine Business Corporation Act, effective on January 1, 1972, the courts are in this case called upon to construe and apply the dissenting shareholder appraisal provisions of the Act, 13–A M.R.S.A. § 909 (1974).

In this proceeding, the Superior Court (Cumberland County) had the task of determining the "fair value" as of February 17, 1976, of the common stock of Libby, McNeill & Libby (hereafter "Libby"), a former Maine corporation, engaging primarily in production of canned foods. Libby, McNeill & Libby, Inc. (hereafter "petitioner"), the Delaware successor by merger to the Maine corporation, sought this determination in order to establish the magnitude of its liability to former Libby shareholders who dissented from the merger authorized by all necessary votes on February 18, 1976.[1] The Superior Court valued the Libby stock at $8.55 per share. On appeal, petitioner maintains that the Superior Court justice should have accepted the recommendation of the court-appointed appraiser, who valued the stock at $6.00 per share. Petitioner also contends that the Superior Court erred in ordering petitioner to pay the shareholders' expert fees and expenses. The dissenting shareholders cross-appeal, claiming that the Superior Court's valuation of $8.55 per share is too low, and that the trial justice should have awarded them their attorneys' fees, as well as their experts' fees and expenses.

The major issue generated by this appeal is the proper definition of the term "fair value" as it is used in the dissenting shareholder provisions of the Maine Business Corporation Act. We hold that the Superior Court justice's interpretation of the term "fair value" was not entirely correct. On reviewing the record made before the appraiser, we conclude that the Superior Court should have accepted the appraiser's recommendation that a fair value of $6.00 per share be set for the Libby stock. Accordingly, we sustain petitioner's appeal and deny the shareholders' cross-appeal.

## I. Facts of the Case

Pursuant to the procedure for a "short form merger" authorized by the Maine Business Corporation Act, 13–A M.R.S.A. § 904 (1974),[2] Libby was in early 1976 merged into a Delaware corporation, Universal Food Specialties (hereafter "UFS"), a wholly owned subsidiary of Nestle Alimentana S.A., a Swiss company (hereafter "Nestle").

The corporate relationship between Nestle and Libby dates from 1960. In that year Nestle and its affiliates began buying Libby shares. In 1963 Nestle increased its holdings to 9% of all outstanding common stock. By 1967 Nestle owned 36% of the Libby stock and had become Libby's principal shareholder.

Libby found itself in serious financial difficulty by 1969. Cash dividends had not been paid for eight years, and it suffered a net loss of $15.3 million in fiscal year 1969. Unable to raise needed capital through bank loans or securities sales, Libby turned to Nestle for help, and Nestle responded by providing Libby with a $10.5 million unsecured loan. Libby's economic misfortunes

1. 13–A M.R.S.A. § 909(1) provides:

 "A shareholder having a right under any provision of this Act to dissent to proposed corporate action shall, by complying with the procedure in this section, be paid the fair value of his shares, if the corporate action to which he dissented is effected. The fair value of shares shall be determined as of the day prior to the date on which the vote of the shareholders, or of the directors in case a vote of the shareholders was not necessary, was taken approving the proposed corporate action, excluding any appreciation or depreciation of shares in anticipation of such corporate action."

2. Section 904(1) provides in part:

 "Any corporation, in this Act termed the 'parent corporation,' owning at least 90% of the outstanding shares of each class of one or more other corporations, in this Act termed the 'subsidiary corporations,' may merge one or more such subsidiary corporations into itself *without the approval by a vote of the shareholders of either the parent or any such subsidiary corporation,* by complying with the following procedure . . . ." (Emphasis added)

continued through 1970, and existing bank lines of credit were imperiled. Libby's banks requested that Nestle make additional capital available to Libby. Consequently, in October 1970 a subscription offer granted each Libby common shareholder the right to purchase additional shares on a one-for-one basis at $5.25 per share (a price then about 10% below the market price). By agreeing to subscribe pro rata to the newly issued stock and also to purchase any other shares not subscribed to by other shareholders, Nestle increased its Libby holdings to over 51%. Thereupon the banks agreed to ·extend credit to Libby so long as Nestle retained its position as Libby's majority shareholder.

■ By 1974 Nestle had increased its holdings to over 60%. Then, in 1975, Nestle decided to eliminate all minority shareholders and to turn Libby into a wholly owned subsidiary. Nestle transferred ownership of all its Libby shares to the wholly owned Nestle subsidiary UFS, and on May 29, 1975, UFS made public its tender offer to acquire all remaining shares of Libby common stock. By its tender offer UFS clearly appraised the public that if it received enough Libby stock to raise its holdings to more than 90%, UFS intended to effect a "short form merger" of Libby with UFS. UFS offered to pay $8.125 per share, a price 65% above the stock market price of $4.88 per share on the New York Stock Exchange at which Libby stock traded on May 23, 1975, the last day prior to announcement of the UFS tender offer.[3] More than three quarters of all available shares of Libby common stock were sold to UFS in response to its tender offer, thus giving UFS an aggregate holding of more than 90% of Libby common stock.

On February 18, 1976, petitioner's board of directors approved the plan for a short form merger of Libby and UFS pursuant to 13–A M.R.S.A. § 904. No shareholder vote or further corporate action by Libby was required for authorization of the merger under Maine law. See n. 2 above. Following refusal by both state and federal courts to enjoin the merger, *Tanzer Economic Associates, Inc. Profit Sharing Plan v. Universal Food Specialties, Inc.*, 87 Misc.2d 167, 383 N.Y.S.2d 472 (Sup.Ct., March 10, 1976); *Merrit v. Libby, McNeill & Libby*, 533 F.2d 1310 (2d Cir., April 5, 1976), the merger was completed on April 6, 1976. From among those who had rejected the UFS offer of $8.125 per share, 110 shareholders owning 66,140 shares of Libby stock filed written demands for payment of the fair value of their shares and otherwise perfected their right to participate in this valuation proceeding. *See* 13–A M.R.S.A. § 909(3).

On May 7, 1976, petitioner commenced this Superior Court proceeding to determine the "fair value" of the Libby common stock as of February 17, 1976, "the day prior to the date on which the vote . . . of the directors . . . was taken approving the [merger], excluding any appreciation or

**3.** The fact that tender offers frequently, if not usually, involve a premium in excess of current market price is established both by the evidence introduced before the appraiser in the case at bar and by reported court decisions, *see. e. g., Gibbons v. Schenley Industries, Inc.*, 339 A.2d 460, 468 (Del.Ch.1975). The investment banker advising the Nestle affiliate in its tender offer for Libby stock recommended the premium in order to overcome shareholder inertia. He testified: "Typically, when a common stock is so widely dispersed not only is it difficult to reach all the shareholders, but many small shareholders are indifferent to tender offers because the process of tendering shares is complicated and it is not worth their while to fill out the necessary papers."

Dissenting shareholders who refused the tender offer and instead insisted on a judicial determination of fair value are not entitled to receive the tender offer premium. In other words, the $8.125 premerger tender offer price does not establish any floor under the amount the court may fix as the value of the Libby stock in the appraisal proceeding. *Id.* That is not to say, however, that the tender offer price might not have some evidentiary significance, at least if no explanation were presented for the tender offer's including a premium. The parties also have not made an issue as to the evidentiary significance, if any, of the surviving corporation's making, as required by 13–A M.R.S.A. § 909(7), "a written offer to each such dissenting shareholder to pay for such shares at a specified price *deemed by such corporation to be the fair value thereof.*" (Emphasis added)

depreciation of shares in anticipation of such corporate action." *See* 13–A M.R.S.A. § 909(1). Pursuant to 13–A M.R.S.A. § 909(9)(E), the Superior Court appointed to serve as appraiser a retired justice of the Supreme Judicial Court, with statutory authority "to receive evidence and recommend a decision on the question of fair value." *Id.* The appraiser held hearings for four days late in April 1977, receiving expert testimony on behalf of both petitioner and the dissenting shareholders. He submitted his report on December 21, 1977, which he supplemented on January 16, 1978.

The appraiser determined that three components should be considered in determining "fair value": stock market price, investment value, and net asset value. After assigning dollar-per-share values to those three components, the appraiser weighted the factors to reach a composite "fair value" per share. The Superior Court justice accepted the appraiser's recommended values for each of those three components. However, the justice rejected the relative weightings assigned by the appraiser to those components, and thus rejected the appraiser's recommendation for the per share value of the Libby stock. The table below sets forth the differing approaches and results of the appraiser and the Superior Court:

| | | Weightings | | | |
|---|---|---|---|---|---|
| Components | | Appraiser | | Superior Court | |
| Stock Market Price | ( $4.88) | 40% | ($1.95) | 10% | ($0.49) |
| Investment Value | ( $2.52) | 40% | ($1.01) | 45% | ($1.12) |
| Asset Value | ($15.41) | 20% | ($3.08) | 45% | ($6.94) |
| Total ("Fair Value") | | | $6.04 | | $8.55 |

Noting that expert opinions based on alternative valuation methods placed the value of the Libby stock in the range of $5.00 to $6.50 per share, the appraiser recommended that the Superior Court round off the "computation" of the composite value and find a fair value of $6.00 per share for the Libby common stock.

In assigning weights to the components of value, the appraiser and the Superior Court relied upon different conceptions of the meaning of "fair value." We now address ourselves to the issue of the proper definition of that statutory term.

## II. *The Judicial Determination of "Fair Value"*

Nowhere does the Maine Business Corporation Act define the "fair value" which it in section 909(1) directs that dissenting shareholders should be paid.[4] Although the phrase "fair value" is also used in the comparable dissenting shareholder provision of the Model Business Corporations Act (section 81), the official comment to the Model Act sheds little light on the intended meaning of those words. That comment simply states: "The cases indicate that there is no definite rule for determining 'fair value' but that the proper result in each case will

---

4. From its first enactment Maine's predecessor valuation statute provided: "The [supreme judicial] court, or any justice thereof in term time or in vacation, shall hear the parties and determine as soon as practicable the *value* of the stock of such dissenting shareholders . . ." (Emphasis added) P.L.1891, ch. 84, § 4. The valuation statute remained substantially in this form until January 1, 1972, when the Maine Business Corporations Act went into effect and substituted "fair value" for "value." P.L.1971, ch. 439, § 1. None of the reported decisions involving our earlier statute addressed the question of how a court was to go about determining "the value" of stock. *See May v. Midwest Refining Co.,* 25 F.Supp. 560 (D.Me.1939); *Johnson v. C. Brigham Co.,* 126 Me. 108, 136 A. 456 (1927); *Fenderson v. Franklin Light & Power Co.,* 121 Me. 213, 116 A. 414 (1922); *Fenderson v. Franklin Light & Power Co.,* 120 Me. 231, 113 A. 177 (1921).

depend upon the particular circumstances of the corporation involved." Among other jurisdictions with valuation statutes similar to our own,[5] we do find, however, a consensus that the component elements to be relied upon in determining "fair value" are stock market price, investment value, and net asset value.[6]

 While it is generally agreed that the process of stock appraisal involves consideration of all three of those elements of value, "the weight to be given to these factors depend[s] upon the circumstances of each individual case. The courts have consistently declined to lay down hard and fast rules . . .." *Tabulating Card Co. v. Leidesdorf*, 32 Misc.2d 720, 723, 223 N.Y. S.2d 652, 656 (Sup.Ct.1961). In a given case, one element may be particularly unreliable, thus necessitating greater reliance on one or both of the other elements. The weighting of these interdependent elements of fair value is more akin to an artistic composition than to a scientific process. A judicial determination of "fair value" cannot be computed according to any precise mathematical formula. *Flarsheim v. Twenty Five Thirty Two Broadway Corp., supra* 432 S.W.2d at 255.[7]

If the public stock market functioned as a perfect market, where all actors relied upon complete and accurate information, then courts would need to look only to the stock market price, and the valuation of dissenters' shares would be greatly simplified. Unfortunately, a perfect market is only a theoretical and abstract ideal, and in the real world the stock market is to varying degrees less than a perfect indicator of the value of a corporate concern. Thus, consideration of the net asset value and of the investment value of a corporation provides a check against myopic reliance on the sole criterion of stock market price.

All three components of "fair value" may not influence the result in every valuation proceeding, yet all three should be considered. "Compelling the consideration of all of them, including those which may turn out to be unreliable in a particular case, has the salutary effect of assuring more complete justification . . . of the conclusion . . . reach[ed]." *Endicott Johnson Corp. v. Bade*, 37 N.Y.2d 585, 588, 376 N.Y.S.2d 103, 338 N.E.2d 614, 616 (1975). In the case at bar all three elements of fair value suffered from particular weaknesses that cautioned against excessive reliance on any one factor. Although the appropriate valuation date was February 17, 1976, the last available stock market price unaffected

---

**5.** A number of state statutes use terms such as "fair market value" (*e. g.*, Cal.Corp.Code § 4300; Haw.Rev.Stat. §§ 417–19, 417–22) or "market value" (Okla.Stat.Ann., tit. 18, §§ 1.159–1.161). In those jurisdictions, in cases where there exists a regular market in the shares of the stock to be valued, the valuation process is apparently limited to an examination of the price of the stock on the stock market. Our statute, however, does not use the term "fair market value." "[W]hen the statute does not specify 'market value', a variety of factors must be considered." Note, "Valuation of Dissenters' Stock," 79 *Harv.L.Rev.* 1453, 1462 (1966).

**6.** *See, e. g., General Securities Corp. v. Watson*, 251 Ark. 1066, 477 S.W.2d 461 (1972); *Tri-Continental Corp. v. Battye*, 31 Del.Ch. 523, 74 A.2d 71 (1950); *Gibbons v. Schenley Indus., Inc.*, 339 A.2d 460 (Del.Ch.1975); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216 (Del.1975), aff'g 312 A.2d 344 (Del.Ch.1973); *Flarsheim v. Twenty Five Thirty Two Broadway Corp.*, Mo., 432 S.W.2d 245 (1968); *Tome Land & Improvement Co. v. Sil-*

va, 83 N.M. 549, 494 P.2d 962 (1972); *Endicott Johnson Corp. v. Bade*, 37 N.Y.2d 585, 376 N.Y.S.2d 103, 338 N.E.2d 614 (1975); *Application of Behrens*, 61 N.Y.S.2d 179 (Sup.Ct.1946), aff'd mem. 271 App.Div. 1007, 69 N.Y.S.2d 910 (1947); *Brown v. Hedahl's—Q B & R, Inc.*, N.D., 185 N.W.2d 249 (1971); *In the Matter of Northwest Greyhound Lines*, 41 Wash.2d 672, 251 P.2d 607 (1952); Fletcher, *Cyclopedia of Corporations* § 5906.12 (1971 rev.ed.); Lattin, *Corporations* § 166 (1971); Note, "Valuation of Dissenters' Stock," 79 *Harv.L.Rev.* 1453 (1966); Comment, "Appraisal Statutes—Elements in the Valuation of Corporate Stock," 55 *Mich.L. Rev.* 689 (1957); Annot., "Valuation of Stock of Dissenting Shareholders," 48 A.L.R.3d 430 (1973).

**7.** *See also General Securities Corp. v. Watson*, supra 251 Ark. 1066, 477 S.W.2d at 463; *Brown v. Hedahl's—Q B & R, Inc.*, supra 185 N.W.2d at 258; *In re West Waterway Lumber Co.*, 59 Wash.2d 310, 317, 367 P.2d 807, 813 (1962).

by the announcement of the intended Nestle/Libby merger was the market price of nearly nine months earlier; *i. e.*, that of May 23, 1975. The investment value factor also had weaknesses as a measure of fair value, given the highly subjective nature of the determination of a capitalization ratio and the erratic history of Libby earnings. The use of book value as the surrogate for net asset value made reliance on the net asset value element especially suspect.

The appraiser, faced with these shortcomings of all three elements, was required to make the best of what he had to do with. Relying on the expert testimony available to him, it was the appraiser's job to assess the relative deficiencies of the three elements and to arrive at a weighting scheme which, in his judgment, would best reflect the "fair value" of the dissenters' shares. He determined that stock market price and investment value as indicators of fair value were roughly equal in reliability and significance, and that roughly half as much emphasis ought to be placed upon net asset value. Accordingly, the appraiser assigned weights of 40%, 40%, and 20% to stock market price, investment value, and net asset value, respectively. As we shall explain, we believe that in arriving at his recommendation the appraiser exercised sound judgment, well supported by the factual record and by relevant principles of law.

◼ Both the appraiser and the Superior Court considered all three elements of fair value and engaged in the process of giving relative weights to them. However, the Superior Court departed from the weighting recommendations of the appraiser,[8] because of the court's belief that the fact the

minority shareholders were unwilling sellers, forced to part with their shares in the course of the statutory merger, should be given special consideration. In weighting the three components the Superior Court justice "view[ed] the transaction in terms of the respective losses and benefits to the parties to the actual transaction." Fixing "fair value" at a price which would satisfy a willing buyer and a willing seller would not, according to the Superior Court justice, "adequately compensate the shareholder for his loss of freedom to deal with his property as he sees fit." Thus the justice below rejected the appraiser's recommendation of a 40% weighting for stock market price and instead assigned only a weight of 10% to that element.

In addition, the Superior Court justice asserted that the unsophisticated shareholder carried a mental image of his shareholder rights that focused on his right to part ownership of the assets of the corporation. To compensate the dissenting shareholders for the deprivation of this cherished right of part ownership of corporate assets, the Superior Court ruled that the appraiser erred in assigning net asset value a weight of only 20%. The justice substituted a weighting of 45% for net asset value.

◼ In thus attributing significance to impairment of the dissenting shareholder's economic freedom to dispose of his property when and as he wished and to the shareholder's mental image of his undivided ownership rights in corporate assets, the Superior Court justice committed an error of law that requires the judgment below to be set aside as far as the weighting of the ele-

---

8. The appraiser defined fair value as "what a willing seller would take and a willing buyer would give in a free arm's length transaction in which the parties are informed as to the facts requisite for a rational judgment." We find the appraiser's statement of the law, so far as it goes, to be correct. In approving the "willing buyer/willing seller" approach, however, we do not mean to be understood to say that the market price of the stock in issue is to be taken as the sole criterion of the "fair value" of the stock. The appraiser of course did not so limit his search. We reiterate that all three of the component elements of value should be con-

sidered: stock market price, net asset value, and investment value. Each element provides evidence of the price at which a willing buyer and a willing seller would strike a bargain. In any given case, however, after careful consideration of all relevant facts and circumstances, a court may conclude that one of the elements is a highly unreliable indicator of fair value, as compared with the other elements, and may properly decide to assign little or no weight to that element. Thus, the weight to be accorded stock market price will vary, according to the particular circumstances of each case.

ments of fair value is concerned. The statutory right of a dissenting shareholder to be paid the fair value of his shares is not designed to compensate the shareholder for "psychological" injuries, or to take into account the particular mental image of ownership rights possessed by the shareholder. In the same way, compensation for real estate taken under the power of eminent domain disregards whatever emotional or psychological attachments the owner may have to his property, as well as any "nontransferable values arising from [the owner's] unique need for [the] property. . . ." *United States v. 564.54 Acres of Land*, 441 U.S. 506, 516, 99 S.Ct. 1854, 1860, 60 L.Ed.2d 435 (1979), quoting *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). Furthermore, "fair value" is not measured by any unique benefits that will accrue to the acquiring corporation, any more than the compensable value of property taken by eminent domain is measured by its special value to the condemnor. *Cf., e. g., Gilmore v. Central Maine Power Co.*, 127 Me. 522, 145 A. 137 (1929). The fair value of shares is to be determined on the basis of what a reasonable and objective observer would consider to be a price that reflects the intrinsic value of the right of stock ownership, without regard to any subjective mental processes of the dissenting shareholders or any special benefits to be derived by the acquiring corporation.

The Superior Court's "view[ing] the [merger] in terms of the respective losses and benefits to the parties to the actual transaction" does violence to the statutory mandate, 13–A M.R.S.A. § 909(1), that the value of the dissenters' shares shall be valued without relation to the proposed merger. We cannot read any other way the statutory provision that the fair value of the shares shall be determined as of the day before the merger vote was taken and furthermore shall "exclud[e] any appreciation or depreciation of shares in anticipation of such corporate action." *Id.* The dissenting shareholders are entitled to receive the full fair value of their shares, but that value must be determined independently of the merger transaction that gave the dissenting shareholders the statutory right to be bought out and their corporation the statutory duty to pay them off. The appraisal proceeding is not at all concerned with the losses to the *particular* dissenting shareholders or with the benefits derived by the *particular* acquiring corporation in the merger, except as those losses and benefits would be reflected in the price that would be bargained out in a completely free market between *any* willing buyer and *any* willing seller in absence of the merger.

Although we must set aside the Superior Court's judgment based as it was upon an erroneous view of the meaning of "fair value," we do not find it necessary to remand this case for further proceedings in the Superior Court. Where, as here, the trial court's decision is rendered entirely upon the basis of written evidence, an appellate court can read and evaluate the record as well as can the trial justice. Under the circumstances of this appeal, final resolution of the dispute by the Law Court, without a remand, serves the interests of all parties by providing a speedy determination of the issues in controversy and makes the most efficient use of our total judicial resources. *See Beaulieu v. Francis Bernard, Inc.*, Me., 393 A.2d 163, 166 (1978); *Northeast Investment Co. v. Leisure Living Communities, Inc.*, Me., 351 A.2d 845, 854 (1976); *Cunningham v. Cunningham*, Me., 314 A.2d 834, 839 (1974); *Thacher Hotel, Inc. v. Economos*, 160 Me. 22, 23, 197 A.2d 59, 60 (1964). To remand to the Superior Court with directions that the appraiser's recommendation be reexamined in light of the principles here declared would later invite another appeal to the Law Court by one or both of the parties, and thus remand would not be the most efficient way for this court to carry out its function of correcting error in this case between these parties. Furthermore, under the circumstances of this case, the Law Court can best perform its lawgiving responsibility for the guidance of counsel, appraisers, and Superior Court justices in future dissenting shareholder cases, by actually applying to this written record

the proper rules as we see them. We proceed, then, to place ourselves in the position of the Superior Court, and to make for it a determination of the "fair value" of the dissenting shareholders' stock.

In setting the fair value of the Libby stock, the recommendation of the appraiser, elaborated by his reasoned report, serves the court both as a starting point and as a useful guide. The appraiser lived with this case for several months and at the four-day hearing held to receive financial data and expert opinion he served as the eyes and ears of the court. Of course, the court is not bound by either the findings of fact or the conclusions of law made by the appraiser.[9] The statute provides that "[t]he *court* shall . . . fix the fair value of the shares." (Emphasis added) On the other hand, the statute authorizes the appointment of an appraiser "to receive evidence *and* [to] recommend a decision on the question of fair value." (Emphasis added) Had the legislature intended to limit the role of the appraiser to that of merely "receiving evidence," it would not have also empowered the appraiser to "recommend a decision" on the ultimate question of value.[10] While the final determination of fair value remains always the responsibility of the Superior Court, the question the court addresses is, Should the appraiser's "recommend[ation of] a decision on the question of fair value" be accepted? In seeking an answer to that question, the court carefully examines the appraiser's analysis of the record and the applicable law by which he arrived at his recommended decision.

In the case at bar, the question before the Superior Court—and now before this court in lieu of remand—is, Should the court accept the appraiser's recommendation that it decide that the fair value of Libby stock on the pertinent valuation date was $6.00 per share? Specifically, the question for the court is whether the appraiser, on this record, was correct (i) in fixing the dollar amount of the three individual components of fair value, namely, stock market price, investment value, and net asset value, and (ii) in ascribing weight to those components of 40%, 40%, and 20%, respectively. We now turn to a consideration whether the appraiser correctly weighed the constituent elements of fair value. We will return later, in connection with consideration of the dissenting shareholders' cross-appeal, to the appraiser's determination of the individual elements.

### III. Weighting the Components of Fair Value

#### A. Stock Market Price

Where the evidence reveals the existence of a free and open market, characterized by a substantial volume of transactions that makes the market a fair reflection of the judgment of the investing public, a court may justifiably assign a greater weight to stock market price than to net asset value or investment value. *See, e. g., Leighton v. American Tel. & Tel. Co.*, 397 F.Supp. 133 (S.D.N.Y.1975); *Southdown, Inc. v. McGinnes*, 89 Nev. 184, 510 P.2d 636 (1973); *Application of Marcus*, 273 App.Div. 725, 79 N.Y.S.2d 76 (1948), *aff'd* 303 N.Y. 711, 103 N.E.2d 338 (1951). "[P]rices, in an established market in normal times, of a widely held stock bought for investment by well informed persons [are] entitled to 'considerable weight'." *Martignette v. Sagamore Mfg. Co.*, 340 Mass. 136, 139, 163 N.E.2d 9, 13 (1959).

In the case at bar the appraiser recommended assigning stock market price a weight of 40%. The dissenting shareholders argue that the market for Libby com-

---

9. In those special circumstances (likely to occur infrequently in stock valuation cases) where the credibility of witnesses becomes critical in resolving factual conflicts in the testimony heard by the appraiser, his findings on those disputed factual matters are entitled to the deference inherent in the "clearly erroneous" test.

10. 13–A M.R.S.A. § 909(9)(E) provides in part: "The court may, if it so elects, appoint one or more persons as appraisers to receive evidence and *recommend a decision* on the question of fair value. The appraisers shall have such power and authority as shall be specified in the order of their appointment or an amendment thereof." (Emphasis added)

mon stock was, in the time period immediately preceding the tender offer, too "thin" to be a reliable indicator of fair value and, therefore, that the appraiser should have assigned less weight to the stock market price component of fair value. A "thin" market is characterized by a low volume of public trading. Courts have reduced the weighting assigned to stock market price in cases where evidence of a "thin" market is present. *See, e. g., David J. Greene & Co. v. Dunhill International*, 249 A.2d 427 (Del. Ch.1965). In the record of the present case, however, we see no such evidence as to invalidate the appraiser's 40% weighting.

On the contrary, the record convincingly demonstrates that the stock market price of May 23, 1975, was determined by a substantial market of willing buyers and willing sellers. Libby was a public company, and ownership of its common stock was widely dispersed. Prior to the tender offer, 3.768 million shares were held by persons other than Nestle, constituting a sizeable public "float" available for trading. Moreover, those shares were widely distributed among some 15,700 shareholders of record.

Trading activity in Libby stock was relatively brisk. The stock was listed on the New York Stock Exchange (NYSE), the Midwest Stock Exchange, and the Pacific Stock Exchange. In the year preceding the tender offer, more than one million Libby shares (excluding shares purchased by Nestle and its affiliates) changed hands. During the first quarter of 1975, Libby's average daily trading volume was 2,700 shares, well in excess of the daily trading volume in other cases where stock market price has been given primary emphasis in the determination of fair value. *See, e. g., Application of Marcus, supra*, 273 App.Div. at 728, 79 N.Y.S.2d at 78–79 (daily average of 700 shares traded on NYSE); *Jones v. Healy*, 184 Misc. 923, 936, 55 N.Y.S.2d 349, 360 (Sup.Ct.1945) (about 1,000 shares per day traded on NYSE).

The dissenters also contend that Nestle's position as a majority shareholder prior to the date of the tender offer should have induced the appraiser to give less weight to the stock market price component. We recognize that an acquiring parent corporation which occupies the position of a majority shareholder may be able to control "the timing of the decision to merge based on the parent's anticipation of a substantial increase in the subsidiary's earnings." A majority shareholder may have access to information affecting future prospects of the subsidiary corporation that is not available to the general public, and that is not yet "reflected in the market price of the subsidiary's stock . . . ." Thus the acquiring corporation may be "in a position to induce appraisal at a time when the outsiders seeking the appraisal have little or no capacity to ascertain . . . the likelihood that the enterprise is currently worth more than its past record suggests." Brudney & Chirelstein, "Fair Shares in Corporate Mergers and Takeovers," 88 *Harv.L. Rev.* 297, 305–06 (1974). *See Universal City Studios v. Francis I. duPont & Co.*, 312 A.2d 344 (Del.Ch.1973), *aff'd* 334 A.2d 216 (1975); *Endicott Johnson Corp. v. Bade*, 37 N.Y.2d 585, 376 N.Y.S.2d 103, 338 N.E.2d 614 (1975). Nestle's ownership of 61% of all Libby shares prior to its announcement of its tender offer and impending merger on May 27, 1975, was of course well known to the expert witnesses and the appraiser. We find nothing in this record to justify making a further reduction of the already reduced weight of 40% accorded to stock market price by the appraiser on the basis of expert testimony.

In summary, whatever weaknesses inhere in stock market price as an indicator of the fair value of Libby stock, we conclude that the appraiser's recommendation of a weight of 40% for this component reflects careful consideration of all relevant circumstances. He reduced stock market price to a minority position among the component factors, and considering the weaknesses that impair reliability of "investment value" and "net asset value" in the case at bar, the appraiser in our judgment was none too high in his assessment of a relative weight of 40% for stock market price. We accept his recommendation.

## B. *Investment Value*

The determination of investment value represents an estimate of the corporation's earning capacity. Investment value is fixed in a two-step process. First, based on the corporation's recent earnings history, an average annual earnings figure is calculated. In arriving at this figure, one must select a period of years of sufficient length to assure an adequate data base. Here the expert offered by petitioner chose to survey earnings over the most recent five year period, 1971–1975.[11] In addition to the selection of the applicable time frame, the determination of average annual earnings requires the exercise of subjective judgment in excluding from consideration those gains and losses that are viewed as "extraordinary" (*i. e.*, gains or losses stemming from transactions not expected to recur).[12]

The second step in the process of calculating investment value is to select a capitalization ratio, or earnings multiplier. The product of the capitalization ratio and the average annual earnings figure yields the investment value of the corporation under examination.

The earnings record of Libby had undergone some fluctuation in the years preceding the Nestle tender offer. Petitioner's expert witness compiled the following figures representing its earnings per share:

| Year ending June 30 | Earnings (loss) per share | |
|---|---|---|
| | Excluding Extraordinary Items | Including Extraordinary Items |
| 1966 | $ 0.87 | $ 0.94 |
| 1967 | 0.70 | 0.74 |

| Year ending June 30 | Earnings (loss) per share | |
|---|---|---|
| | Excluding Extraordinary Items | Including Extraordinary Items |
| 1968 | 1.19 | 1.19 |
| 1969 | (0.11) | (1.85) |
| 1970 | (1.26) | (1.01) |
| 1971 | 0.04 | 1.47 |
| 1972 | (0.19) | (0.07) |
| 1973 | 0.45 | (0.90) |
| 1974 | 1.08 | 1.38 |
| 1975 | 1.00 | 1.00 |

In computing the average annual earnings per share, petitioner's expert concluded he should give more weight to the recent years of 1973, 1974, and 1975 than to the earlier years of 1971 and 1972 because increased capital expenditures during the early 1970s accomplished a significant upgrading of Libby's operating facilities and made the earnings record of the later years a better predictor of future earnings. By assigning a weight of $2/13$ to each of the years 1971 and 1972 and a weight of $3/13$ to each of the more recent three years, that expert computed an average annual earnings for that five year period of $0.56 per share.[13]

Petitioner's expert then examined the capitalization ratio of companies comparable to Libby in order to determine an appropriate earnings multiplier. Finding Del Monte, Green Giant, and Stokely-Van Camp to be comparable companies based on their participation with Libby in the national market for canned fruits and vegetables,

11. "There is no mystical significance in taking a ten or a five or a three year average of earnings to get a more accurate picture of the fundamental earning capacity of the business than is given by the earnings of a single year; and there is no reason why one period should be used for all businesses. It must, however, to use the words of a legal decision, be broad enough to '. . . cover a sufficient period to show the settled condition of things'." Dewing, *The Financial Policy of Corporations* 376 (1953).

12. See the discussion in Part IV of this opinion of the shareholders' claim that the exclusion of certain allegedly "extraordinary" items was erroneous.

13. This weighting procedure accords with recommended valuation practice. "[I]f the most recent years are deemed to be of greater significance than earlier years, the average is weighted in favor of the later years." 8 Cavitch, *Business Organizations* § 169.07[3] (1979).

petitioner's expert made an extensive study of the sales, profit margins, inventory turns, capital spending history, and dividends records of each of those three companies and contrasted those data with comparable data on Libby. He found capitalization ratios of 6.0, 6.6, and 5.5 for Del Monte, Green Giant, and Stokely-Van Camp, respectively. From the fact that Libby had lagged well behind all three of its competitors in all the areas investigated, the expert concluded that Libby should be assigned a capitalization ratio of 4.5. Applying this multiplier to Libby's average annual earnings of 56 cents per share, he determined that the investment value of the dissenting shareholders' stock was $2.52 per share. The appraiser concluded that petitioner's expert exercised "fair and rational judgment" in his computation of investment value. We agree.

The expert witness presented by the dissenting shareholders gave his opinion that Libby's earnings record was so erratic that no weight whatever should be assigned to investment value as a component of fair value. Indisputably, the erratic nature of Libby's earnings detracts from the relative weight that should be accorded investment value computed on the basis of averaging widely fluctuating annual earnings. On the other hand, the erratic nature of Libby's earnings is apparently a fact of life of its business, depressing the intrinsic value of its shares, and if that fact is appropriately recognized in a reduced capitalization ratio, it should properly have an impact on the fair value determination. The mere fact that Libby's earnings record has been erratic is no reason for denying investment value any part at all in the determination of fair value. It is merely another factor to consider in assessing the relative reliability of the three tests of stock value.

On this record the appraiser had ample support in according a 40% weight to investment value. Conceptually, investment value is a central component of fair value. "The assets of a company are of

value chiefly because of their earning capacity . . . ." 8 Cavitch, *supra*, § 169.-07[3]. Here Libby had a history of returning a profit in each of the three years immediately preceding the tender offer and in seven of the preceding ten years. We accept the appraiser's recommendation that investment value be assigned a weight of 40% in this case.

C. *Net Asset Value*

Generally net asset value should not be heavily weighted in stock valuation unless the valuation being made is for liquidation purposes. Where the acquired business will be continued as a going concern, the value of the corporate assets bears little or no relation to the value of the stock of the corporation. A recent decision of a Delaware court noted:

"There is good reason for not taking the asset-value factor seriously. The average market price of a common stock over the years depends chiefly on the earnings power and the dividend payments. These, in turn, usually do not bear any close or reasonably consistent relation to the asset value. . . . Investors and speculators have found that the asset value is typically no guide at all to earning-power value or average market price. Hence they have gradually come to give the asset-value factor practically no weight." *Gibbons v. Schenley Industries, Inc.*, 339 A.2d 460, 473 (Del.Ch. 1975), quoting from Graham, Dodd, Cottle & Tatham, *Securities Analysis* 217 (4th ed. 1962).

To have its maximum persuasiveness in finding the "fair value" of Libby stock, net asset value should have been determined by a current appraisal of all the corporation's property, tangible and intangible. No such asset appraisal was made in the case at bar—by either petitioner or the dissenting shareholders. As a substitute for net asset value, both sides relied on net book value determined from Libby's audited balance sheet.[14] The net value of corporate assets

14. The shareholders' expert contended that the net book figure should be increased by $5.00

per share to represent the value of Libby's trademark and $5.00 per share to represent the

reported on the balance sheet in accordance with accounting convention represents principally historical cost less book depreciation. Book value of property would be equal or even close to its actual current value only by sheer coincidence. "There is nearly complete agreement that book value does not accurately represent the fair value of corporate assets." Note, "Valuation of Dissenters' Stock," 79 *Harv.L.Rev.* 1453, 1457 (1966). As Judge Learned Hand stated over fifty years ago:

"The suggestion that the book value of the shares is any measure of their actual value is clearly fallacious. It presupposes, first, that book values can be realized on liquidation, which is practically never the case; and second, that liquidation values are a measure of present values. Every one knows that the value of shares in a commercial or manufacturing company depends chiefly on what they will earn, on which balance sheets throw very little light." *Borg v. International Silver Co.*, 11 F.2d 147, 152 (2d Cir. 1925).

In the opinion of petitioner's expert, net asset value should receive a weight of 20%, only half the weight accorded each of the other two factors. The dissenting shareholders' expert, however, contended that net asset value should be the sole criterion for determining "fair value"; that is, should receive a weight of 100%. Recognizing that net asset value was "the weak link in the chain of appraisal factors" and that there were dangers inherent in the use of book value as a valuation tool, the appraiser agreed with petitioner's expert. We believe the court should accept the appraiser's recommendation. The shareholders' expert placed exclusive weight on net asset value because of his belief that stock market price and investment value were unreliable indicators of "fair value" in this case. We have already indicated, however, that in our view stock market price and investment value, although here subject to deficiencies as indic-

ators of fair value, were properly assigned weights of 40% each. In view of the obvious imprecision of using book value as a measure of asset value and also in view of the fact that net asset value, even if accurately appraised, is in the words of Judge Hand in *Borg v. International Silver Co.*, supra at 152, little indication of "what people will pay for the shares," the weighting of 20% recommended by the appraiser is, if anything, on the high side.

## D. Conclusion

In summary, we accept in the case at bar the appraiser's recommended weight assignments of 40% to stock market price, 40% to investment value, and 20% to net asset value, considering the way in which each of those elements of fair value was here determined. The relative weight to be given to those three elements depends much upon the facts of the individual case, including the relative confidence that the weighting tribunal has in the accuracy of those three subsidiary determinations themselves. On all the facts of this case we find no reason for not following the recommendation of the appraiser.

## IV. Cross-Appeal Issues

On their cross-appeal the dissenting shareholders raised issues affecting the valuation of component elements of fair value. They maintain that the Superior Court justice erred in accepting the appraiser's recommended per-share values assigned to the component elements and that each element has been undervalued.

First, the dissenting shareholders challenge the determination of stock market price. They contend that the figure of $4.88 per share, taken from the closing price of Libby stock on the New York Stock Exchange on May 23, 1975, fails to take into account the change in general market prices that occurred between that date and February 17, 1976, when the Libby board of directors voted to approve the Nestle/Libby

value of its corporate organization. We join the appraiser and the Superior Court in rejecting this contention. *See our discussion in Part IV of this opinion.*

merger. They argue that the Superior Court should have undertaken to construct hypothetically what the "true" market price of Libby stock would have been on the New York Stock Exchange on February 17, 1976, if no tender offer announcement had ever been made. They urge the court to assume that Libby stock would have shared the fortunes of the stock of Libby's food packing competitors. We find the assumption that Libby stock would have enjoyed a price increase similar to that enjoyed by its competitors' stock during that nine month period a speculative exercise at best. Furthermore, evidence in the record indicates that Libby stock did not regularly participate in general market upswings. And, finally, Libby's earnings during the nine months following the tender offer declined sharply, a fact which in the absence of the tender offer at a higher price would have tended to depress the Libby stock price.

In cases where limited transactions in stock make determination of a stock market price difficult, courts have approved the construction of a hypothetical market price based on expert testimony. *See Application of Delaware Racing Association*, 42 Del.Ch. 406, 213 A.2d 203 (Del.1965), *aff'g* 42 Del.Ch. 175, 206 A.2d 664 (Del.1965); *Vought v. Republic-Franklin Insurance Co.*, 117 Ohio App. 389, 192 N.E.2d 332 (1962). Here, however, there is no occasion for resorting to hypotheticals. The Libby stock price on May 23, 1975, was approximately the same as for several months preceding the tender offer announcement. It provides a solid basis for the stock market price component of fair value. To depart from that established figure in this case on the basis of supposition would reduce the reliability of that element in the ultimate weighting.

Second, the dissenting shareholders allege that the Superior Court erred in accepting the appraiser's recommended figure for investment value. They contend that the appraiser should not have accepted the judgment of petitioner's expert witness who testified that the exclusion of certain "extraordinary" gains derived from Libby's sale of fixed assets and from a change in the inventory accounting method used by Libby was in accord with accepted accounting practices.

In calculating average annual earnings, one excludes "extraordinary" transactions, or those transactions which are unrelated to normal business operations.[15] But the dissenters contend that the sale of fixed capital assets was a regular corporate practice and that Libby made capital gains from sales of fixed assets in 15 out of the 20 years preceding the Nestle tender offer. Petitioner's expert, however, responded that it was unlikely that such sales would continue to be a source of income in future years and that sales of such fixed assets were properly viewed as a temporary management strategy for disposing of obsolete facilities while replacing them with more modern and technologically more efficient plants. The appraiser and the Superior Court accepted the testimony of petitioner's expert as persuasive. We see no reason to do otherwise. Similarly, the exclusion of the income derived from the change in inventory accounting was entirely proper, since the change brought about a realization of "income" that will not be repeated in the future and that is not indicative of the future earnings potential of the enterprise.

Third, the shareholders claim that net asset value has been understated because

15. One court has succinctly distinguished between the exclusion of "extraordinary items", a proper valuation practice, and the exclusion of unusually good or bad years, an improper practice:

"[E]xtraordinary transactions, which are not related to normal business operations, are customarily excluded from earnings in an appraisal action. See *Adams v. R. C. Williams & Co., Inc.* [39 Del.Ch. 61, 158 A.2d 797 (1960)] in which the court distinguished between the act of excluding from earnings unusual and extraordinary transactions and the inappropriate action of the appraiser in that case in restricting the number of years for averaging earnings to the two years immediately preceding the merger solely on the ground that the company had substantial savings in such years." *Gibbons v. Schenley Industries, Inc.*, 339 A.2d 460, 469 (Del.Ch. 1975).

the appraiser and the Superior Court failed to take into account the value of Libby's trademark and management organization. The shareholders' expert argued that $10 per share should be added to Libby's net book value in order to reflect the value of those two intangibles.

No one would disagree with the abstract proposition that the assets to be valued in determining the net asset value component should include intangibles to the extent they have value separate from tangible assets. There are, however, several bases for justifying the refusal by both the appraiser and the Superior Court to add $10 per share to the $15.41 per share net book value of Libby common stock. First and foremost, there is little in the shareholders' appraisal of those intangibles at $10 per share to commend it as an accurate appraisal or as a significant factor in the intrinsic worth of the Libby stock. The expert conceded that he fixed the $10 per share value on those intangibles through an "extremely subjective" process. He based his valuation of the trademark on "public acceptance of the name Libby and a buying of five hundred million dollars of their product a year." Thus, he recognized that the value of the trademark was already reflected in sales, and thus also in earnings. The other components of fair value—stock market price and investment value—reflect and indeed measure the extent to which assets, including intangibles, in fact contribute to the corporation's earning capacity and intrinsic worth. In view of the fact that the stock market says the Libby stock is worth only $4.88 per share and also the fact that analysis of actual Libby earnings indicates an earnings potential or investment value of only $2.52 per share, it is difficult to conceive that the Libby trademark and corporate organization have any value that is not more than adequately covered by the $15.41 per share assigned to "net asset value."

Furthermore, the crude inexactitude of using book value as the equivalent of asset value works against adding something more onto that already uncertain base. One could as well assume that book value covers the current value of *all* assets, including intangibles (whether or not carried on the balance sheet), as to assume that it is equal to current appraised value of merely tangible assets. In the application of such a grossly imprecise measure, a fully depreciated physical asset (reflected at zero in net book value) is hard to distinguish from an intangible asset that is carried on the balance sheet at zero or at only a nominal figure.

In any event, for good and sufficient reasons discussed in Part III(C) of this opinion, net asset value is entitled to minor weight in determining fair value. The appraiser was in our opinion overgenerous, if anything, in assigning a 20% weight to the net asset value figure of $15.41. This record utterly fails to show that the end result of the appraiser's determination of the three constituent elements and application of a 40–40–20 weighting (namely, a computed "fair value" of $6.04) does not adequately reflect any value of the Libby trademark and corporate organization.

Fourth and finally, the dissenting shareholders maintain that the appraiser and the Superior Court erred in refusing to accept the testimony of their expert witness that the book value of Libby's assets should be adjusted upwards, by means of a technique known as "price level accounting." By that technique the historical cost of previously acquired assets is indexed upward to account for the effects of inflation. Not only is there an absence of judicial precedent to support the claim that price level accounting can properly be utilized in a stock appraisal proceeding, but a generally accepted treatise on accounting practices specifically cautions against the use of such techniques for appraisal purposes. Deloitte, Haskins & Sells, *Accounting Practices* 876 (1978). There is no reason in logic to support the contention that the particular mix of property owned by Libby appreciated or depreciated in step with changes in general average price levels.

## V. *Conclusion*

In summary we reject each of the cross-appeal claims raised by the dissenting

shareholders concerning the proper determination of stock market price, investment value, and net asset value. Having previously decided that the appraiser's recommendations as to the 40–40–20 weighting of those factors should be accepted, we conclude that the appraiser's ultimate recommendation as to the fair value of the dissenters' stock should also be accepted. Other evidence in the record tending to prove a value of the Libby stock of less than $6.00 justified the appraiser's rounding off the computed "fair value" of $6.04. Accordingly, we direct the entry of a judgment of fixing $6.00 per share as the fair value of the Libby common stock on February 17, 1976.

██ Since the fair value of Libby stock is significantly less than the $8.125 per share offered and paid to all Libby shareholders other than the dissenters, we have no statutory basis for awarding the dissenting shareholders attorneys' fees.[16] Nor is there any "good cause" for awarding the dissenters their experts' fees and expenses.[17] Plainly, circumstances might arise in which a court in its sound discretion would be justified in assessing against the corporation all or part of the dissenters' costs of presenting expert witnesses. For example, such might well be the case where the dissenters provided essential valuation evidence not available otherwise in the proceeding. The experts presented by the shareholders did not perform any such function in the case at bar. The controlling statute does not authorize us to assess against the corporation any of the dissenting shareholders' expenses for attorneys and experts.

The entry must be:

Appeal sustained and cross-appeal denied.

Judgment of Superior Court dated September 29, 1978, set aside.

Remanded for entry by the Superior Court of a judgment consistent with the opinion herein.

No costs on appeal allowed to any party.

DELAHANTY, J., did not sit.

---

**16.** 13–A M.R.S.A. § 909(9)(H) provides in part: "Such expenses [assessed against the corporation] shall include reasonable compensation for and reasonable expenses of the appraisers, but shall exclude the fees and expenses of counsel for any party and shall exclude the fees and expenses of experts employed by any party, unless the court otherwise orders for good cause. If the fair value of the shares as determined materially exceeds the amount which the corporation offered to pay therefor, or if no offer was made, the court in its discretion may award to any shareholder who is a party to the proceeding such sum as the court may determine to be reasonable compensation to any expert or experts employed by the shareholder in the proceeding, and may, in its discretion, award to any shareholder all or part of his attorney's fees and expenses."

**17.** On its appeal petitioner claims that section 909(9)(H), see n. 16 above, should be read to require that, at least where the alleged "good cause" for the assessment of experts' fees against the corporation is an excess of the fair value found by the court over the amount previously offered by the corporation to the dissenting shareholders, that excess must be material. Since the Superior Court found that the excess of $8.55 over $8.125 was not material, petitioner argues the court erred in awarding experts' fees. Since we find fair value to be $6.00, and since we deny the allowance of experts' fees on other grounds, we have no occasion to address the issue of law raised by this point of petitioner's appeal.