**HIRAM RICKER & SONS, Plaintiff-Appellee,**

v.

**STUDENTS INTERNATIONAL MEDITATION SOCIETY, Defendant-Appellant.**

**No. 73-1273.**

United States Court of Appeals, First Circuit.

Heard June 6, 1974.

Decided July 17, 1974.

George R. Halsey, Boston, Mass., with whom Robert I. Deutsch and Ruboy, Deutsch & Krasnow, Boston, Mass., were on brief, for appellant.

Enid M. Starr, with whom Bernard A. Dwork and Barron & Stadfield, Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

This is a diversity action based on a contract. Plaintiff-appellee Ricker owns a 2500-acre resort complex in Poland Springs, Maine, which includes lodgings, a golf course and a beach. At the beginning of 1970, only the golf course and a single adjacent building, the Poland Springs Lodge, were actually in use and open to the public. In February 1970, representatives of the defendant-appellant Society contacted Ricker about taking over some of the unused facilities from June 28 to July 26 for a course to train new instructors of transcendental meditation.[1] After some negotiation, Ricker agreed to furnish rooms, facilities and three vegetarian meals and a snack per day for the course participants.[2] In exchange, the Society was to pay Ricker based on a specified schedule of room rates and the number of persons who would attend. The Society would be responsible for the headcount necessary to determine its final bill. The training course was held at the Poland Springs complex on the dates scheduled. The Society paid Ricker a total of $185,000 in a series of payments, some in advance and some during the course.

Ricker brought this action seeking $77,508.36 as the balance allegedly due on the contract.[3] Alternatively, Ricker sought the same amount on the theory of quantum meruit. In response, the Society counterclaimed for return of the $185,000 in payments already made. At trial, Ricker presented evidence tending to show that more persons attended the training course than were accounted for in the Society's payments. Ricker also presented evidence that the Society improperly reduced some of the agreed-upon room rates as it made its calculations. The Society presented evidence to rebut these assertions. With respect to its counterclaim, it also presented evidence tending to show that the rooms and dining facilities which Ricker provided were dirty and inadequate. Finally, the Society raised the issue whether under Maine law Ricker could recover at all under the contract or in quantum meruit, in view of its apparent failure to obtain certain licenses required by statute.[4]

The district court submitted all issues to the jury. With respect to licenses, it instructed:

"... if you should find from the evidence in this case that the plaintiff was not licensed under the statutes that I have just read to you ... you *would be warranted* in finding for the defendant on the claim

---

1. The Society is a nonprofit California corporation, the purpose of which is to spread the teachings of Maharishi Mahesh Yogi, an exponent of transcendental meditation. The Maharishi was also named as a defendant in Ricker's complaint, but the district court directed a verdict in his favor at the close of Ricker's evidence. Ricker does not appeal that decision.

2. There was no formal contract. Instead, the basic agreement was embodied in certain correspondence admitted into evidence.

Some modifications were made subsequently and several others were disputed at trial.

3. This figure is taken from Ricker's amended complaint. Initially, Ricker sought $76,899.36.

4. Although this case was brought in the District Court for the District of Massachusetts, the parties agree that the law of Maine governs the substantive issues in the case. The contract was largely negotiated in Maine and wholly executed there.

brought by the plaintiff against the defendant." (Emphasis added.) [5]

The jury returned a verdict for Ricker in the amount of $65,780.00 and rejected the Society's counterclaim. The court entered judgment on the verdict, adding $9,494.16 in interest.

The Society raises a variety of issues on appeal. We will consider them in an order somewhat different from that set forth in the briefs.

*Offer of Settlement*—The Society contends that the district court improperly admitted evidence of an offer to settle Ricker's claim. However, we hold that the evidence to which the Society objects was not an offer to settle within the meaning of the rule calling for exclusion.

The precise testimony was this. Saul Feldman, the president of Ricker, became increasingly dissatisfied with the size of the periodic payments the Society made to him during the one-month training course. Feldman felt that more persons had attended the course than the Society would concede. On July 26, the last day of the course, he called on Jerry Jarvis, a Society executive. At this time, pursuant to their contract, Feldman anticipated receipt of the final payment. He testified:

"[Jarvis] passed me a yellow sheet of paper saying, 'This is what we owe you. If you agree and sign a release absolving us from any and all damage and all future bills we will pay you.' It was $44,000."

Counsel for the Society moved to strike this testimony on the ground that it was an inadmissible offer of settlement. The court refused. Whereupon the yellow sheet itself was received in evidence and read to the jury by Ricker's counsel, again over objection. Nothing on the sheet referred to an offer of settlement.

It was entirely a series of calculations, which concluded that the Society owed Ricker a final bill of $44,163.25.

It is, of course, true that evidence of settlement negotiations is generally inadmissible. On the other hand, there is a "well-recognized exception regarding admissions of fact as distinguished from hypothetical or provisional concessions conditioned upon the settlement's completion." NLRB v. Gotham Indus., Inc., 406 F.2d 1306, 1313 (1st Cir. 1969). *See generally* 4 Wigmore, Evidence § 1061 (Chadbourn rev. 1972). In the instant case, the yellow sheet handed to Feldman on the final day of the course represented the Society's "unconditional assertion" of what it thought it actually owed Ricker based on the contract. *See* 4 Wigmore, *supra*, at 34. It was not a hypothetical or conditional sum intended only to forestall the additional costs of litigation. Indeed, although Ricker was unhappy about the size of the early payments, until it received the Society's final payment offer of $44,000, it could not determine whether it had an actual controversy with the Society. The rule excluding offers of settlement is designed to encourage settlement negotiations after a controversy has actually arisen. It also prevents admission of evidence that does not represent either party's true belief as to the facts. Neither policy would have been served by excluding Feldman's testimony about the Society's final payment offer, or the yellow sheet on which that offer was calculated.

*Hearsay Objections*—As indicated earlier, Ricker did not handle the registration of course participants. Instead, it was to rely upon the Society's headcount in determining the final bill under the contract. During the course, however, Feldman became suspicious of the Society's tally because he seemed to be

5. The court further said:
"I instruct you that it will be your duty, and your duty alone, from the evidence before you to determine whether or not the plaintiff was licensed and, if so, is he then entitled to be paid for any balance of the contract? If you find he was not licensed and therefore he is not entitled to be recompensed you will find for the defendant *or you would be warranted in finding for the defendant*." (Emphasis added.)

serving far more meals than warranted. Therefore, on three occasions he asked several of his maintenance employees to go around from building to building, counting the number of persons occupying each room. According to Feldman, they reported their findings to him in note form, indicating more guests than the Society asserted.[6] Feldman said the notes were destroyed and that later, from memory, he compiled tables of upward "adjustments" to the figures the Society had submitted to him. These adjustments were admitted into evidence over objection.

As both parties agree, the tables of adjustments compiled by Feldman were hearsay.[7] They were based on reports to him by maintenance employees who themselves were not present in court to testify. Ricker asserts that the evidence was nonetheless admissible under the business-records exception to the hearsay rule. 28 U.S.C. § 1732 (1970). We disagree. A crucial aspect of the business-records exception is that entries be prepared as a *regular* part of the business. "The entry offered must of course be a part of a *series of entries* or *reports,* not a casual or isolated one." 5 Wigmore, Evidence § 1525 (3d ed. 1940) (emphasis in original). See Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). Otherwise, there is no basis for the presumption of reliability which is at the heart of the exception. The room-check here by Ricker's maintenance employees was hardly the kind of regular, systematic business activity which is encompassed by the exception. The method they em-

ployed, *see* note 6 *supra,* hardly warranted a presumption of reliability. Moreover, another requirement of the exception is that entries be made contemporaneously with the transaction. 5 Wigmore, *supra,* § 1526. Here, Feldman made the entries, *from memory,* at least a week after the maintenance employees last reported to him. For this reason also, there is no basis for a presumption of reliability. Therefore, the exhibits were improperly admitted. Instead Ricker should have called the maintenance employees as witnesses.

Ricker alternatively contends that even if there was error it was harmless. Again, we disagree. The documentary listing of purported "short" counts by the Society was likely to have a profound effect on the jury's factfinding. This was the strongest evidence supporting Ricker's contention that the Society cheated in counting the number of course participants. A new trial is therefore warranted.

*Licenses*—Although the preceding holding requires at least a new trial, we also must consider the licensing issue raised by the Society because this could preclude a judgment for Ricker in any event. As we indicated earlier, the court submitted to the jury the question of whether Ricker possessed certain licenses required by Maine statutes at the time the training course was held. Specifically these were the "victualer's" license, Me.Rev.Stats.Ann. tit. 30, § 2751 (1973 Supp.),[8] and the sanitation license, Me.Rev.Stats.Ann. tit. 22, § 2482 (1965).[9] Moreover, by using the phrase

---

6. "The housekeepers or housemen who are in charge of each building, when they made their inspections, would let me know if every bed in that house was used or if there was some beds that were not being used. I believe they arrived at that by observing the beds and the bedding and by looking in the closet or in the bathroom to see if there were two toothbrushes or two different size shoes or different kind of clothes, and they would—when they made their three checks, they would say, 'All beds are being used except' and they would note the exception, that two beds, one not used, or three beds, one not used."

7. Strictly speaking, it was double hearsay. Feldman's entries themselves were a form of hearsay. The information from employees on which he based those entries was separate hearsay.

8. "§ 2751. License required

No person shall be a common innkeeper, victualer or tavernkeeper without a license, under a penalty of not more than $50."

9. "§ 2482. License; required

No person, corporation, firm or copartnership shall conduct, control, manage or operate, for compensation, directly or indi-

"you would be warranted" the court's instruction allowed the jury to find for Ricker even if it was not properly licensed at the time of the course.

The Society contends that this was an error in two respects. First, it asserts that the evidence conclusively established that Ricker did not have either type of license during the course, with one exception.[10] Therefore, it claims that the question was improperly submitted to the jury. Second, the Society contends that under Maine law the absence of the licenses absolutely precluded recovery by Ricker either on the contract or in quantum meruit. Therefore, it claims additional error in the jury instruction which permitted a verdict for Ricker even if it had no licenses.

We agree with the first contention. It is clear from the record that Ricker's victualer's license expired on the Tuesday after the first Monday in May 1970. The expiration date is established by statute, see Me.Rev.Stats.Ann. tit. 30, § 2752 (1973 Supp.), and expressly stated on the face of the license itself. Feldman testified that he thought the license, which was issued in December 1969, was valid for at least a year. But his assumption, even if in good faith, cannot validate an otherwise invalid license. Similarly, the present record conclusively establishes that with two partial exceptions, Ricker did not have sanitation licenses for any of its buildings used by the Society. See note 10, supra. Therefore, there was no reason for the court to have submitted these questions to the jury.

The issue of whether the absence of these licenses precluded any recovery by Ricker is far more troubling. Maine law controls this question and the Maine court has not spoken on the subject since 1897, when it decided Randall v. Tuell, 89 Me. 443, 36 A. 910. There, the court construed a victualer's-license statute virtually identical to the one now in effect.[11] It held that a hotel-owner who failed to obtain such license was barred from recovering $28 on a contract with a woman he boarded for two weeks. Although the licensing statute itself did not provide for this ancillary consequence, the Maine court said:

> "It is the general doctrine, now settled by great weight of authority, that where a license is required for the protection of the public, and to prevent improper persons from engaging in a particular business, and the license is not for revenue merely, a contract made by an unlicensed person in violation of the act is void." Id. at 445, 36 A. at 910.

The Randall court examined the legislative purpose behind the victualer's-license statute and concluded that it was intended to protect the public rather than to raise revenue. Therefore, the unlicensed hotel-owner did not recover. See also Stanwood v. Woodward, 38 Me. 192 (1854).

Four years after Randall, the Maine court relied upon it in holding that an unlicensed insurance broker could not recover commissions he had earned under an employment contract. Black v. Security Mut. Life Ass'n, 95 Me. 35, 49 A. 51 (1901). In addition, the Maine court has cited Randall with apparent approval in four other decisions, the most recent being in 1964. Thacher Hotel, Inc. v. Economos, 160 Me. 22, 197 A.2d 59 (1964); Lipman v. Thomas, 143

---

rectly, any catering establishment, or establishments preparing foods for vending machines dispensing foods other than in original sealed packages, or any eating or lodging place, recreational or overnight camp, unless the same shall be licensed by the department."

Note that this statute requires a separate license for each building, while the victualer's license is obtained by the individual operating such buildings.

10. Midway through the course, two of the seven buildings were inspected and received sanitation licenses. However, one of these licenses was made "conditional" because of health hazards found on the premises. The other buildings used by the Society never had a license during the entire course.

11. The only difference was that the former statute omitted the words, "or tavernkeeper." See n. 8 supra.

Me. 270, 61 A.2d 130 (1948); Donahue v. City of Portland, 137 Me. 83, 15 A.2d 287 (1940); Hinckley v. Giberson, 129 Me. 308, 151 A. 542 (1930).[12]

Yet even though the *Randall* decision has never been repudiated or modified since 1897, we are unclear whether the Maine court would apply it today to the facts of the instant case so as to preclude recovery by Ricker either on the contract or in quantum meruit. A number of factors contribute to these doubts.

The most significant one is the extremely large sum of money involved in the present litigation. The *Randall* decision barred recovery of $28. Even giving due weight to inflation, clearly the equitable considerations are far different in the instant case where the Society seeks to bar recovery of $65,780 plus interest. Moreover, if *Randall* did control, the Society logically could argue for return of the $185,000 it had earlier paid on the contract. Thus, Ricker could lose at least $65,780—and possible more than $250,000—simply for its failure to comply with two licensing statutes which expressly provide for combined penalties of not more than $150. *See* Me.Rev. Stats.Ann. tit. 22, § 2487 ($100 maximum); *id.* tit. 30, § 2751 ($50 maximum).[13]

The Maine court has never faced this sort of situation.[14] However, a leading commentator, reviewing the holdings of other jurisdictions, has summarized them as follows:

"It must be remembered that in most cases the statute itself does not require these forfeitures. It fixes its own penalties, usually fine or imprisonment of minor character with a degree of discretion in the court. The added penalty of non-enforceability of bargains is a judicial creation. In most cases, it is wise to apply it; *but when it causes great and disproportionate hardships its application may be avoided.* It is true that the method of avoidance may be by specious distinctions. It may be denied that the statute in the case is for the protection of public health and morality; [footnote omitted] or the court may find that the specific transaction was only sporadic and exceptional and that the unlicensed plaintiff was not really carrying on the business or profession. [footnote omitted]" 6A Corbin on Contracts § 1512, at 714–15 (1962) (emphasis added).

Putting aside the cases applying "specious distinctions," we note two separate methods by which courts in other jurisdictions have avoided unduly harsh application of *Randall*-type rules. First, they have simply made an equitable exception to such rules in the interest of justice. "Justice requires that the penalty should fit the crime; and justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going not to the state but to repudiating defendants." 6A Corbin, *supra,* at 713. Thus, in John E. Rosasco Creameries, Inc. v. Cohen, 276 N.Y. 274, 11 N.E.2d 908 (1937), the New York court held enforceable a contract for $11,-000 even though the plaintiff milk dealer was unlicensed. Among its reasons, the

12. In *Thacher Hotel,* the court distinguished *Randall* in holding that a hotel-owner's recovery on a management contract was not precluded by an alleged defect in compliance with a liquor-license statute. Similarly, in *Lipman,* the court distinguished *Randall* in holding that a poultry supplier's recovery on a sales contract was not precluded by its failure to file a certificate required by statute. The *Lipman* court said of *Randall*: "[T]he decision is based on public policy and the prohibitory character of the statute." 143 Me. at 274, 61 A.2d at 132. Speaking generally of the cases it was distinguishing, the court added, "The purpose of the statutes involved in these cases would be wholly thwarted unless the contracts were held void, and are not therefore decisive of the case at bar." *Id.* at 274–275, 61 A.2d at 132. The citations of *Randall* in *Donahue* and *Hinckley* were largely collateral to the holdings in those cases.

13. This assumes, of course, that the *Randall* decision on victualer's licenses applies by analogy to sanitation licenses. The Maine court has never so held.

14. The precise amount at stake in the *Black* case, *supra,* is not stated. However, the insurance commissions there could hardly have amounted to the extremely large sums involved here.

court noted that "if the contract is declared unenforceable, the effect will be to punish the plaintiff to the extent of a loss of approximately $11,000 and permit the defendants to evade the payment of a legitimate debt." More recently, the California Court of Appeal similarly declined, despite the fact of no license, to invalidate a $40,000 contract. The court stressed the equitable considerations:

"Despite the illegality of the contract, plaintiff should not be denied relief. The rule requiring courts to withhold relief under the terms of an illegal contract is based on the rationale that the public importance of discouraging such prohibited transactions outweighs equitable considerations of possible injustice as between the parties. [citations omitted] However, the rule is not an inflexible one to be applied in its fullest rigor or under any and all circumstances. A wide range of exceptions has been recognized. [citations omitted] Where the public cannot be protected because the transaction has already been completed, no serious moral turpitude is involved, defendant is the one guilty of the 'greatest moral fault,' and defendant would be unjustly enriched at the expense of plaintiff if the rule were applied, the general rule should not be applied. [citation omitted] In such circumstances, equitable solutions have been fashioned to avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff. [citation omitted]"

Southfield v. Barrett, 13 Cal.App.3d 290, 294, 91 Cal.Rptr. 514, 516 (1970). *See also* Fomco, Inc. v. Joe Maggio, Inc., 8 Cal.Rptr. 459, 356 P.2d 203 (Cal.1960), vacated on other grounds, 55 Cal.2d 162, 10 Cal.Rptr. 462, 358 P.2d 918 (1961); Schloss v. Davis, 213 Md. 119, 131 A.2d 287 (1957). Second, at least two courts

have allowed unlicensed plaintiffs to recover the reasonable value of their work, relying on equitable considerations presented by the facts. *See* Wood v. Black, 60 So.2d 15 (Fla.1952); Gatti v. Highland Park Builders, 27 Cal.2d 687, 166 P.2d 265 (1946); cf. Crawford v. Holcomb, 57 N.M. 691, 262 P.2d 782 (1953) (dictum). This alternative would not necessarily require an explicit exception to the *Randall* decision because there the Maine court did not consider the possibility of a restitutionary remedy. Thus, it is possible under Maine law that even if Ricker cannot recover on its contract with the Society, it could still recover in quantum meruit.[15]

Of course, the fact that other jurisdictions have declined to enforce *Randall*-type rules in extreme situations such as the present one would not necessarily affect our interpretation of Maine law if the Maine court had expressed a desire to enforce *Randall* strictly in all situations. Instead, however, the Maine court itself has not precluded recovery on a contract for failure to possess a license since its decision in *Black* in 1901. Also, although *Randall* was cited with apparent approval relatively recently in *Thacher Hotel* and *Lipman, supra,* it is significant that the citations in both of these cases came as the court was distinguishing *Randall,* declining to extend its holding to newer fact situations. Thus, it is considerably uncertain whether the Maine court would extend *Randall* to this case, and if not, which of the alternative approaches outlined above it might follow. In sum, *Randall* cannot, in our view, be deemed a clear precedent controlling the instant case.

■ In this situation the wisest course would be to certify the license issue to the Maine court for decision, pursuant to Me.Rev.Stats.Ann. tit. 4, § 57 (1973 Supp.) and Maine Rule of Civil Procedure.[16] Therefore, in reversing

---

15. The *Gatti* court stressed that plaintiff had "substantially complied" with the licensing requirement at issue there. In the instant case, at least with respect to the victualer's license, it can be argued that Ricker substantially complied based on the fact that it had a valid license at the time it negotiated

the contract with the Society. *See* Latipac, Inc. v. Superior Court, 64 Cal.2d 278, 49 Cal.Rptr. 676, 411 P.2d 564 (1966).

16. The considerations on when to certify recently set forth by the United States Su-

the judgment and remanding for a new trial because of the hearsay error, we instruct the district court first to certify to the Supreme Judicial Court of Maine the question of whether Ricker's failure to comply with the Maine statutes on victualer's licenses and sanitation licenses bars its recovery of any judgment against the Society either in contract or in quantum meruit. In so certifying, it may frame the question in such manner as it deems appropriate and should also ask any additional related questions it deems necessary in order to instruct the jury as to the applicable principles of Maine law. Hence it may wish to inquire whether and to what extent a Maine jury would be entitled to consider the lack of either license in determining whether there was substantial performance of any contract. Obviously, if the Maine court determines that recovery is barred on both grounds, then there will be no need for a new trial.[17]

Reversed and remanded for further proceedings not inconsistent with this opinion.

preme Court in Lehman Bros. v. Schein, 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (Apr. 29, 1974) and by the Maine court in White v. Edgar, 320 A.2d 668 (Me.1974), fully support certification in the instant case.

17. Although several other issues were raised by the parties, we do not reach them in light of our disposition.