7 F.3d 233
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
KENTUCKY CENTRAL LIFE INSURANCE COMPANY, Plaintiff-Appellee,
v.
Vonda L. JONES, Nancy Gay Jones, Beneficiaries of James A.
Jones, deceased, Defendants-Appellants.
 No. 92-6263.
 United States Court of Appeals, Sixth Circuit.
 Aug. 27, 1993.
 
 Before GUY and NELSON, Circuit Judges; and HOOD, District Judge.*
 PER CURIAM.
 
 
 1
 Defendants Vonda L. Jones and Nancy Gay Jones, beneficiaries of decedent, James A. Jones, appeal the judgment of the district court rescinding a life insurance policy issued to decedent by plaintiff Kentucky Central Life Insurance Company because of a material misrepresentation made by him concerning his history of smoking. Defendants raise the following allegations of error: (1) the district court improperly allowed inadmissible hearsay to be considered by the jury; and (2) the district court mistakenly concluded that the misrepresentation at issue increased plaintiff's "risk of loss" within the meaning of section 56-7-103 of the Tennessee Code. We affirm.
 
 I.
 
 2
 On December 17, 1988, James A. "Bud" Jones submitted an application for life insurance to the Kentucky Central Life Insurance Company (Kentucky Central). The application was completed by the Kentucky Central agent who sold the policy, but it was reviewed and signed by Jones. In it, he sought coverage in the amount of $450,000.
 
 
 3
 The policy subsequently issued to Jones on January 16, 1989, was provided to him at a non-cigarette smoker discount rate. He was eligible for such a rate because of his answer to a question on his insurance application, "Has proposed insured smoked cigarettes in the last 24 months?", to which he had replied in the negative. (App.162).
 
 
 4
 On September 19, 1989, Jones died of an acute myocardial infarction. Kentucky Central was notified of his death and began a routine investigation under the two-year contestability clause in his policy. At about the same time, defendants filed a notice of claim with the company in order to receive payments under the policy as Jones' beneficiaries.
 
 
 5
 In order to help conduct its review of defendants' claim, Kentucky Central utilized the services of Equifax, an independent investigation firm. Merrilyn Jones, an Equifax investigator, contacted the attorney representing defendants and arranged to take a recorded statement from James Jones' widow, Vonda, on November 13, 1989.
 
 
 6
 In her statement, Vonda Jones related extensive details concerning her husband's personal history, indicating that he had quit smoking in June 1988. Merrilyn Jones forwarded a transcript of the statement to Kentucky Central, which requested that she continue her investigation in light of Vonda Jones' comments about her husband's smoking. If James Jones had, indeed, smoked in June 1988, this would be contrary to the representation he made on his insurance application that he had not smoked in the previous 24 months.
 
 
 7
 Merrilyn Jones eventually obtained certain of James Jones' medical records from William Murrey, M.D.; Robert Sadler, M.D.; and Greg Dugger, D.D.S., as well as affidavits from other persons who had been acquainted with him. The doctors' records contained notations intimating that Jones was smoking during the period just before he applied for insurance with Kentucky Central.
 
 
 8
 Dr. Murrey is a general practitioner who began treating Jones as his personal physician in 1980 and who saw him in connection with his hospitalization for pneumonia in February 1988. After examining him, Dr. Murrey reported on Jones' hospital discharge summary form: "Bud has generally been in good health without serious past health problems. He has been a long-term smoker but indicates that he has decided to discontinue smoking with the presence of his illness." (App. 337).
 
 
 9
 Dr. Sadler is a pulmonary specialist to whom Dr. Murrey referred Jones in February 1988 as a result of his pneumonia. On Jones' patient information form, Dr. Sadler wrote: "Quit Smoking Feb 4th." (App. 341).
 
 
 10
 Dr. Dugger was Jones' regular dentist. On June 20, 1988, his dental hygienist, Shirley Evans, marked on Jones' records: "He has quit smoking!!". (App. 373). Jones' visit to Dr. Dugger in June 1988 was his first since his bout with pneumonia. There was no indication in the dentist's records that Jones had previously announced he had stopped smoking.
 
 
 11
 As a result of the information generated by the Equifax investigation, Kentucky Central believed that Jones had misstated his history of smoking on his life insurance application. The company then filed a complaint for a declaratory judgment in the United States District Court for the Middle District of Tennessee, seeking to rescind the insurance contract.[1]
 
 
 12
 At trial, Kentucky Central presented the medical records of Dr. Murrey, Dr. Sadler, and Dr. Dugger; deposition evidence from the former two doctors; and the in-court testimony of Shirley Evans. In addition, the company proffered deposition testimony from Tammy Smith, R.N., who was employed by West Side Hospital in Nashville, Tennessee. As part of Jones' treatment by Dr. Sadler, a number of medical procedures were performed upon him. Prior to those procedures being undertaken, Smith completed a "NURSES' ADMISSION, HISTORY AND ASSESSMENT FORM" for Jones. On the form, Smith wrote down "quit smoking in Feb 1988." (App. 368-69).
 
 
 13
 The company also offered testimony from Morris Howard, an agent with Golden Rule Insurance Company. Howard stated that in November of 1988, James and Vonda Jones completed an application for health insurance. The application, which came into evidence, contained the answer "James, quit about a year ago" to a question as to whether the proposed insured had smoked cigarettes within the past 12 months. (App. 363).
 
 
 14
 Further, Kentucky Central introduced the application for health insurance from the Principal Financial Group that was filled out by James and Vonda Jones in December 1988. The application included the notation "[i]nsured quit smoking" in connection with a question regarding whether the proposed insured "had a weight gain or loss of 10 pounds or more in the past year[.]" (App. 365-66).
 
 
 15
 Aside from the evidence related to Jones' smoking history, Kentucky Central presented testimony from Richard Brumfield, its vice president of underwriting, confirming that, if Jones had informed the company he was a smoker, it still would have issued him a life insurance policy. However, such a policy would have been tendered at a higher rate. James McDonald, Kentucky Central's assistant secretary and claims manager, seconded Brumfield's testimony in this regard.
 
 
 16
 The company also put its chief actuary, Martin Uhl, on the stand. Uhl indicated that if an insured misrepresents his or her smoking status, he or she is placed in the wrong risk category, leading Kentucky Central to assume a risk of loss unsupported by the insured's premium payments. This is because the mortality rate for cigarette smokers is far greater than that for non-smokers.
 
 
 17
 Defendants presented testimony from Vonda Jones that her husband had quit smoking in September 1986, when the couple reunited after experiencing marital difficulties. Her assertion was case in doubt by the statements James Jones had made in her presence on the Golden Rule and Principal applications. In addition, defendants introduced receipts from a hypnotherapist for treatment rendered in October 1986, after the date Vonda Jones gave as the time her husband had stopped smoking. The rest of defendants' evidence largely consisted of testimony from friends and acquaintances of James Jones, who claimed that they had not seen him smoke after 1986 or 1987. However, much of this testimony was inconclusive, contradictory, or otherwise problematic.
 
 
 18
 At the close of the evidence, the district court directed the jury to answer the following query: "Did James A. 'Bud' Jones smoke cigarettes within twenty-four months prior to filing the application with the plaintiff, Kentucky Central Life Insurance Company, on December 17, 1988?" (App. 41). The jury responded in the affirmative. Having received the benefit of the jury's finding and after reviewing the trial transcript, the court determined that Jones' misrepresentation of his smoking history was material under section 56-7-103 of the Tennessee Code because it served to increase Kentucky Central's "risk of loss." As a result, the court declared the life insurance policy issued to him voidable, and ordered Kentucky Central to return the premiums according to the terms of the policy.[2]
 
 II.
 
 19
 Prior to trial, Kentucky Central moved in limine to allow into evidence the medical records and related deposition testimony of Drs. Murrey and Sadler. Defendants objected, asserting that portions of the records constituted inadmissible hearsay.
 
 
 20
 Specifically, defendants took issue with the statement included in the discharge summary form Dr. Murrey prepared in connection with Jones' hospitalization for pneumonia in February 1988: "Bud has generally been in good health without serious past health problems. He has been a long-time smoker but indicates that he has decided to discontinue smoking with the presence of this illness." Defendants also challenged the admission of Dr. Sadler's handwritten notation on Jones' patient information form: "Quit Smoking Feb 4th."
 
 
 21
 The district court deferred ruling on Kentucky Central's motion in limine until trial, when it held that the statements in question were admissible under the exceptions to the hearsay rule set out in Rule 803(4) (Hearsay Exceptions; Availability of Declarant Immaterial--Statements for purposes of medical diagnosis or treatment) and Rule 803(6) (Hearsay Exceptions; Availability of Declarant Immaterial--Records of regularly conducted activity) of the Federal Rules of Evidence.
 
 
 22
 In view of the fact that Kentucky Central was attempting to establish that Jones indeed had smoked within the 24 months prior to the submission of his insurance application, both of the physicians' statements were offered to prove the truth of the matter asserted. As they had been made out of court, they were hearsay. Furthermore, the references in the statements to declarations purportedly made by Jones regarding his smoking habits were also hearsay.
 
 
 23
 Federal Rule of Evidence 805 (Hearsay Within Hearsay) provides: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Thus, in order to have been properly allowed into evidence, both layers of hearsay contained in the medical records had to have been separately covered by exceptions to the hearsay rule.
 
 
 24
 We have no problem finding that the declarations ascribed to Jones fell within the ambit of Rule 803(4). This rule permits the following sorts of statements to come into evidence:
 
 
 25
 Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
 
 
 26
 Declarations made in such a context are especially trustworthy because it is assumed that a person who is or will be undergoing medical treatment will attempt to accurately describe any conditions having a bearing on such treatment. See United States v. Narciso, 446 F.Supp. 252, 289 (E.D.Mich.1977). See also Fed.R.Evid. 803(4) advisory committee's notes (1972); McCormick on Evidence § 292 at 839 (3d ed. West 1984) ("[The] reliability [of statements to physicians and other medical personnel] is assured by the likelihood that the patient believes that the effectiveness of the treatment he receives may depend largely upon the accuracy of the information he provides the physician.").
 
 
 27
 Here, Jones suffered from pneumonia, a serious inflammation of the lungs, and he was asked by Drs. Murrey and Sadler to relate to them his medical history as well as any personal habits which might influence the course of treatment. There can be little doubt that information regarding Jones' smoking history was relevant to the physicians' efforts to alleviate his illness. It was precisely the kind of patient-generated information contemplated by Rule 803(4) as being reliable and credible.
 
 
 28
 Defendants, however, call attention to the five-week gap between the time that Jones was discharged from the hospital (February 26, 1988) and the date that Dr. Murrey dictated and transcribed his discharge summary form (March 31, 1988). Pointing out that Dr. Murrey serviced over 600 patients during the interim period, they contend it was unlikely he would remember with exactitude what Jones had told him about his smoking the month before.
 
 
 29
 When this concern was brought to the attention of the district court, the court found it significant that Dr. Murrey was a general practitioner who had been Jones' personal physician since 1980, and was apparently on familiar terms with him, having referred to him as "Bud" on the discharge summary form. Further, while Dr. Murrey testified that he could not recall all of the details of his conversation with Jones, he averred that the substance of the declaration attributed to Jones was correct. Given his extensive contact with Jones over many years, the court did not believe that the delay in his transcription of Jones' medical records undermined the essential trustworthiness of the declaration.
 
 
 30
 Rule 803(4) does not contain any requirements regarding the time or place that a "statement[ ] made for purposes of medical treatment or diagnosis" must be given in order for it to come into evidence. Accordingly, we are convinced the district court was correct in concluding that the fact Jones' declaration to Dr. Murrey was not memorialized until several weeks later did not affect its admissibility.[3]
 
 
 31
 Defendants also assert that Jones' declaration, "Quit Smoking Feb 4th," noted on the patient information form filled out in conjunction with his visit to Dr. Sadler, should not have been allowed into evidence because Dr. Sadler did not clearly recall Jones having made the declaration. However, Dr. Sadler testified that he did, in fact, interview Jones about his medical history, and identified the notation as being in his own handwriting. While he could not say whether some of the data on the form had been conveyed to him by Dr. Murrey, he was "almost positive [the information giving rise to the notation] came from [Jones]." (App. 273). Consequently, as the authenticity of the form was not in dispute, we are satisfied the district court did not abuse its discretion in finding the declaration actually emanated from Jones.
 
 
 32
 Additionally, defendants argue that the declarations did not fall within the scope of Rule 803(4) because, in their view, the physicians to whom they were made were not concerned with the precise date Jones quit smoking. According to defendants, for diagnostic and treatment purposes, their interest was limited to his general smoking history and current smoking status.
 
 
 33
 This argument is without merit. Both Dr. Murrey and Dr. Sadler indicated, as defendants readily admit, that Jones' smoking history was helpful to them in their assessment of his illness and in their treatment of him. Even assuming, arguendo, that the particular date Jones gave up his habit was not "medically necessary," this is of no moment. What is important are the circumstances under which he supplied this information. Dr. Murrey and Dr. Sadler each asked Jones to recount his smoking history. Their inquiries were plainly relevant to their efforts to cure his illness. The thought behind Rule 803(4) is that when a patient answers questions of this type there is a high probability that the response provided will be trustworthy because of the patient's natural interest in aiding his or her recovery. Here, it cannot be successfully contended that, in reciting his smoking history, the allegedly "superfluous" information Jones furnished the physicians was somehow unreliable and outside the bounds of Rule 803(4).
 
 
 34
 With regard to Dr. Murrey's and Dr. Sadler's notations themselves, defendants claim the district court erred in deeming them records of "regularly conducted business activity" within the meaning of Federal Rule of Evidence 803(6).
 
 
 35
 Rule 803(6) sets outs an exception to the hearsay rule for the following materials:
 
 
 36
 A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
 
 
 37
 "The element of unusual reliability of business records" is derived, in part, from the "duty to make an accurate record as part of a continuing job or occupation." Fed.R.Evid. 803(6) advisory committee's notes (1972). Here, both Dr. Murrey and Dr. Sadler testified that it was their custom to keep the sorts of medical records which contained Jones' declarations about his smoking. See, e.g., Willmore v. Hertz Corp., 437 F.2d 357, 359 (6th Cir.1971). Furthermore, the statements in question were related specifically to the physicians' "business activity"; they contained information which was pertinent to the formulation of their diagnoses of Jones' illness and their strategies for treatment. See McCormick on Evidence § 313 at 883.
 
 
 38
 Defendants, however, strenuously object to the admission of Dr. Murrey's records because he made them more than a month after Jones was discharged from the hospital. As they argued with regard to the district court's application of Rule 803(4), Dr. Murrey saw approximately 600 other patients between the time he interviewed Jones and the time he dictated Jones' discharge summary form. Accordingly, they renew their assertion that Dr. Murrey may have confused Jones' personal history with that of another individual. Given this possibility, they believe "the method or circumstances of preparation [of the form] indicate lack of trustworthiness," such that it should have been kept out of evidence. See Fed.R.Evid. 803(6).
 
 
 39
 We must therefore determine whether the district court abused its discretion in concluding that Dr. Murrey memorialized Jones' declaration "at or near" the time it was made, when this was done five weeks subsequent to the declaration. See id.
 
 
 40
 What constitutes a record created "at or near" the time of the declaration or transaction depends upon the circumstances of the particular case. One treatise proposes that whether the entry was made "within a sufficient time to render it within the exception depends upon whether the time span between the transaction and the entry was so great as to suggest a danger of inaccuracy by lapse of memory." McCormick on Evidence § 309 at 878. Periods ranging from several days to several months have been ruled too long under the facts. See generally United States v. Lemire, 720 F.2d 1327 (D.C.Cir.1983) (22 months), cert. denied, 467 U.S. 1226 (1984); Hiram Ricker & Sons v. Students Int'l Meditation Society, 501 F.2d 550 (1st Cir.1974) (one week).
 
 
 41
 Here, the district court found meaningful Dr. Murrey's acquaintance with Jones as his personal physician for the past eight years. As a result, the court held that "five weeks, between the 26th of February and the 31st of March, is not a sufficient lapse of time that would undermine the trustworthiness of this doctor's recitation of the past history of the patient that[ ] he's been treating for at least since 1980." (App. 229).
 
 
 42
 Defendants, though, cite the deposition testimony of Lynne Becker, custodian of medical records for Hillside Hospital in Pulaski, Tennessee, where Jones had been admitted. Becker stated that, under the hospital's operating procedures, a patient's case history is to be dictated within 48 hours of admission. Dr. Murrey, however, failed to follow the hospital's guidelines as to Jones' history. Defendants assert that this called into question the trustworthiness of the discharge summary form that eventually was filled out for him. They also argue that, as Dr. Murrey breached the hospital's policy concerning the creation of such a record, the district court should have determined it had not been made "in the course of a regularly conducted business activity." See Fed.R.Evid. 803(6).
 
 
 43
 In ruling upon the admissibility of the notations in the discharge summary form under Rule 803(6), the district court underscored that it was not "bound by the hospital's administrative rules." (App. 229). The rationale behind the 48-hour rule was not entirely clear, but it appears to have been instituted to compel physicians with hospital staff privileges not to be lax in their making of certain medically and legally significant records. While the failure to follow such a policy was some evidence of the lack of a trustworthy record, it was by no means determinative.
 
 
 44
 The district court's focus was properly on whether there was enough of a danger that Dr. Murrey's memory was faulty where he had noted Jones' declaration some five weeks after the fact. The passage of time that occurred in that regard is troublesome. However, we do not feel that district court abused its discretion in deciding as it did. The discharge summary form that Dr. Murrey completed for Jones was replete with detail. Its occasionally informal tone reflected their lengthy professional relationship. It gave every indication of being an accurate record.[4]
 
 
 45
 That the form was not dictated in conformity with hospital policy did not mean it was not a record of a "regularly conducted business activity." There was no suggestion that Dr. Murrey did not fill out such a document for every similarly situated patient at some point. The time at which he executed Jones' form went to the issue of its trustworthiness, not to whether it was the sort of record Dr. Murrey normally kept in his medical practice.
 
 
 46
 As for the patient information form that Dr. Sadler made out for Jones, no doubt was raised as to its having been prepared contemporaneous to their meeting. Defendants contend, nonetheless, that Dr. Sadler's notation on the form regarding Jones' smoking habit was unreliable because the exact date Jones stopped smoking was not a matter "within the [physician's] legitimate business concern." (Defendants' Brief at 27). It is evident, however, that Jones' smoking history was the kind of information that Dr. Sadler routinely obtained from his patients. As a pulmonary specialist, it was very much his concern. That Jones may have related to him more precise information than he may have found helpful did not render his notation undependable.
 
 III.
 
 47
 Defendants also argue that the district court erred in holding that Jones' misrepresentation of his smoking history increased Kentucky Central's "risk of loss," as defined by section 56-7-103 of the Tennessee Code.
 
 
 48
 Section 103 of chapter 7 of title 56 of the Tennessee Code (Misrepresentation or warranty will not avoid policy--Exceptions) provides:
 
 
 49
 No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the assured or in his behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.
 
 
 50
 Tenn.Code Ann. § 56-7-103. To avoid coverage under this statute, the insurer must prove (1) than an answer given on an insurance application, or as part of negotiations for an insurance contract, was false, and (2) that the answer was given with the actual intent to deceive the insurer, or that the answer materially increased its risk of loss. Womack v. Blue Cross & Blue Shield of Tenn., 593 S.W.2d 294, 295 (Tenn.1980).
 
 
 51
 In the instant case, the jury found that Jones misrepresented his smoking history on his application for insurance with Kentucky Central. The company conceded that he had not done so with the intent to deceive. However, it asserted that Jones' statement that he had not smoked within the 24 months prior to the submission of his insurance application operated to heighten its risk of loss.
 
 
 52
 In support of this allegation, Kentucky Central introduced evidence from three of its officials. Richard Brumfield, vice president of underwriting, stated that while the company would have tendered Jones a life insurance policy even if he had revealed himself to be a smoker, his falsehood increased the company's risk of loss due to a premium differential. This was further attested to by James McDonald, Kentucky Central's assistant secretary and claims manager. Martin Uhl, the company's chief actuary, explained that Kentucky Central places each insured into a risk pool based upon his or her health, age, sex, and smoking status. If the insured is incorrectly categorized as a result of a false answer on his or her insurance application, the actuarial statistics the company uses to charge a fair premium for accepting the insured's risk of loss are thrown off. In light of such evidence, the district court held as a matter of law that Jones' misrepresentation concerning his smoking history was a material one.
 
 
 53
 The parties agree that whether Jones' misstatement increased Kentucky Central's risk of loss was a question of law for the court. See, e.g., Harris v. State Farm Mut. Auto. Ins. Co., 232 F.2d 532 (6th Cir.), cert. denied, 352 U.S. 827 (1956); Tegethoff v. Metropolitan Life Ins. Co., 424 S.W.2d 565 (Tenn.App.1966); Mutual Life Ins. Co. v. Dibrell, 194 S.W. 581 (Tenn.1916).
 
 
 54
 Defendants, however, claim that Kentucky Central was obligated to put forward "independent, scientific, technical or specialized evidence" that Jones' misrepresentation deprived the company of information which would have affected its appraisal of risk. (Defendants' Brief at 34) (emphasis omitted). See Johnson v. State Farm Life Ins. Co., 633 S.W.2d 484, 488 (Tenn.App.1981). They argue that the company simply could not rely on the avowals of its officials in this regard, calling attention to the following passage from Volunteer State Life Ins. Co. v. Richardson, 244 S.W. 44 (Tenn.1922):
 
 
 55
 It is not to be left to the insurance company to say after a death has occurred that it would or would not have issued the policy had the answer [to the question on the insurance application form] been truly given. It is true the practice of an insurance company with respect to particular information may be looked to in determining whether it would have naturally and reasonably influenced the judgment of the insurer, but no sound principle of law would permit a determination of this question merely upon the say so of the company after the death has occurred. The matter misrepresented must be of that character which the court can say would reasonably affect the insurer's judgment.
 
 
 56
 Id. at 49.
 
 
 57
 We agree with defendants that Richardson requires an insurer to offer "specialized" evidence that the insured's misstatement would have "naturally and reasonably influence[d its] judgment ... in making the contract," had the true facts been known. Milligan v. MFA Mutual Ins. Co., 497 S.W.2d 736, 739 (Tenn.App.1973). The bare, post hoc assertions of the insurer's agents, employees, or officers to this effect will not suffice. Instead, the insurer must demonstrate, by actuarial evidence or otherwise, that the falsehood in controversy caused it to take on either a greater risk of loss than it had bargained for, or a risk that it would not have assumed under any circumstances.
 
 
 58
 However, we disagree with defendants that Kentucky Central did not produce the type of evidence necessitated by Richardson. Uhl gave sound reasons why an insured's smoking has a bearing on risk calculation. Brumfield and McDonald, as knowledgeable company officials, buttressed Uhl's testimony by averring that, due to the effect of smoking on mortality, Kentucky Central offered policies at different rates depending on the insured's smoking status. Hence, the company's evidence was well-grounded in business practice as driven by actuarial prognoses.
 
 
 59
 Defendants protest that Kentucky Central did not demonstrate that persons who smoked cigarettes within 24 months of their seeking insurance are more likely to die than those, like Jones, who smoked only 10 months before completing an insurance application. They maintain that, in the absence of such a showing, the company failed to prove that Jones' misrepresentation was material.
 
 
 60
 Defendants miscontrue Kentucky Central's burden. All the company had to establish under section 56-7-103 was that Jones' misstatement resulted in its assuming a greater risk of loss than it had bargained for. This it was able to do by introducing evidence that it was reasonable to draw a distinction between smokers and non-smokers in assessing risk, and that it made such a distinction in setting premiums.
 
 
 61
 Information which affects the premium an insurer fixes to a risk is plainly a material element of the insurance contract. The situation is not altered where, as in the instant case, the insurer was furnished with erroneous risk-related data by the insured, and the insurer admits that it would have still issued a policy, albeit at a higher rate. The policy that was in fact tendered was extended at the lower rate due to the insured's misrepresentation as to a risk factor the insurer deemed salient, and which may be correlated with the chance of loss. The Tennessee Supreme Court has quite clearly held:
 
 
 62
 Every fact which is untruly stated or wrongfully suppressed must be regarded as material, if the knowledge or ignorance of it would naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of premium.... The determining factor, therefore ... is whether the answer [to a question on an insurance application] would have influenced the company in deciding for itself, and in its own interest, the important question of accepting the risk, and what rate of premium should be charged.
 
 
 63
 Richardson, 244 S.W.2d at 47 (emphasis added) (citation omitted). See also Little v. Washington Nat'l Ins. Co., 241 S.W.2d 838, 841 (Tenn.App.1951) ("Inquiries with respect to a specific disease indicates that the insurer may regard it as material to the risk and it is the duty of the applicant to fully and frankly disclose the true condition as known to him.").
 
 
 64
 When the veneer is stripped away from this case, what we have before us is a contract for insurance. Jones, as a result of his misrepresentation, was able to obtain a life insurance policy at a reduced, non-smoker rate. Systemically, if such a misstatement was not deemed material, "there [would be] every incentive for applicants to lie. If the lie is undetected ... the insured will have obtained excessive coverage for which he has not paid." New York Life Ins. Co. v. Johnson, 923 F.2d 279, 284 (3d Cir.1984).
 
 
 65
 That Jones' misrepresentation was negligent rather than intentional did not make it any less relevant from a business standpoint. The cost of insurance is heavily influenced by the insurer's prediction of risk. Much of the data it uses for such a purpose is derived from the applications for insurance it receives. If this information is rendered less useful by the inclusion of untruths in the applications, however innocent, "premiums will rise over the long run to pay for the excessive insurance proceeds paid out" to unanticipated claimants. Id. The insurer's pricing structure will be adversely affected. Accordingly, Jones' misstatement pertained to information Kentucky Central "deemed necessary to an honest appraisal of insurability." Johnson, 633 S.W.2d at 488. It was therefore material under section 56-7-103.
 
 
 66
 AFFIRMED.
 
 
 
 *
 Honorable Joseph M. Hood, United States District Court for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 Defendants filed a counterclaim, seeking a declaratory judgment that they were entitled to collect on Jones' life insurance policy. In the alternative, should it be determined that Jones' representations concerning his smoking history were untrue and Kentucky Central would have issued a reduced death benefit policy to him for the premium he actually paid, defendants asked for a declaratory judgment that they were eligible to receive such reduced benefits. Additionally, they claimed damages for breach of contract
 
 
 [2]
 The district court also dismissed defendants' counterclaim
 
 
 [3]
 Defendants also argue that it was unclear whether Jones actually made a declaration to Dr. Murrey concerning his smoking or whether Dr. Murrey included such a declaration in his records based on his general knowledge of Jones. If the notation in controversy was simply the product of the physician's familiarity with Jones, we need only consider its admissibility as part of a record of "regularly conducted business activity." See Fed.R.Evid. 803(6). As we make clear, the notation did fall within the hearsay exception delineated in Rule 803(6)
 
 
 [4]
 Even if we were to find otherwise, reversal would not be warranted. Given the totality of the evidence presented at trial, an improper decision of the district court to allow the discharge summary form into evidence would have been harmless error